## Fahnestock v. The State.

MURDER—SOUND MIND.—It is not necessary to aver in an indictment for murder that the person charged is of sound mind. Page 233.

PRACTICE.—Judgment will not be reversed, because of the refusal to strike from the indictment irrelevant or surplus matter. Page 234.

CHANGE OF VENUE.—A change of venue, under sec. 78, 2 G. & H. 407, is addressed to the sound discretion of the court. If this court can review the action of the court below in refusing such a change, the power should only be exercised in a clear case of abuse of that discretion. Page 234.

JUROR.—If, from any previously formed opinion, it would require more or less evidence to satisfy the mind of the existence or non-existence of the material facts involved, then the juror is not impartial, and is incompetent. Page 237.

SAME.—Where the court allowed a person called to serve as a juror to be asked whether his conscientious opinions were such as to prevent him from assessing the punishment of death, and upon his answering in the affirmative, allowed him to be challenged for cause by the state, the ruling was held correct. *Driskell* v. *The State*, 7 Ind..338, approved. Page 237.

EVIDENCE—CHARACTER.—Where defendant's counsel, on trial of an indictment for murder, asked the question, "Do you know the general character of the deceased, when he was intoxicated, from the report of his neighbors?" the court properly refused to permit it to be answered. Page 238.

EVIDENCE.—On a trial of an indictment for murder, it was not improper to permit the prosecution to ask, and witness to answer, what was the occupation of the defendant. Page 239.

INSTRUCTIONS.—The instructions given should not only be a proper exposition of the law, but should be applicable to the facts and evidence of the particular case. Page 239.

| 23 | 231 |
| 130 | 230 |
| 130 | 469 |
| 24 | 231 |
| 130 | 46 |
| 23 | 231 |
| 136 | 665 |
| 23 | 231 |
| 141 | 122 |
| 23 | 231 |
| 145 | 181 |
| 23 | 231 |
| 162 | 557 |
| 23 | 231 |
| 166 | 702 |
| 167 | 329 |

Fahnestock *v.* The State.

INSTRUCTIONS.—The defendant, in a trial for murder, asked the following instruction, which was refused, "If the jury believe from the evidence that the defendant killed the deceased, when there was reasonable apprehension on his part that the deceased was about to inflict upon him great bodily harm, then you should acquit the defendant."

*Held*, that the instruction is not law, and the court correctly refused to give it. Page 257.

MURDER IN THE FIRST DEGREE.—In murder in the first degree, premeditated malice requires that there should be time and opportunity for deliberate thought, and that, after the mind conceives the thought of taking the life, the conception is meditated upon, and a deliberate determination formed to do the act; that being done, then, no difference how soon the fatal resolve is carried into execution, it is murder in the first degree. Page 263.

MURDER IN THE SECOND DEGREE.—In murder in the second degree, the purpose or intention to kill is followed immediately by the act, and is not premeditated, the time and the circumstances are not such as to allow of deliberate thought, yet there must be a formed design and purpose to kill. Page 263.

APPEAL from the *Tippecanoe* Circuit Court.

ELLIOTT, J.—*Edward Fahnestock*, the appellant, was indicted for murder, in the *first* degree, in killing *John Clifford*.

Plea, not guilty. The issue was tried by a jury, who returned a verdict of guilty of murder in the first degree, and that he suffer death. Motions for a new trial and in arrest of judgment were overruled and excepted to, and judgment on the finding of the jury.

Several errors are assigned as reasons for the reversal of the judgment of the Circuit Court, which will be considered in the order in which they are presented in the record.

1. The court overruled the defendant's motion to quash the indictment.

The only objection urged to the indictment is, that it does not aver that the defendant is a "person of sound mind." These words are found in the section of the statute defining the crime of murder in the first degree, and it is urged that they constitute a part of the statutory definition of the crime, and must, therefore, be averred in the indictment. They do not, properly speaking, consti-

Fahnestock *v.* The State.

tute a part of the definition of the crime, but rather of the person capable of committing it. The crime consists in the killing of a human being, purposely and with premeditated malice. There must be a purpose or definite design to destroy life, actuated by a malicious motive. The act must be premeditated, or thought of and determined upon, before its commission. These ingredients can only exist where there is a mind with reflective faculties, capable of thought and consistent reason, to form designs and conclusions; in other words, it requires a person of sound mind to be capable of the acts that constitute the crime. The law presumes every person who has arrived at the years of discretion to be of sound mind; and hence, it is not necessary that the state should prove that fact to justify a conviction. If, in fact, the accused is not of sound mind, it is a legitimate matter for proof in defense, but need not be averred in the indictment. Substantially, the same words were used in defining murder at common law, as well as by statute, and this court has held, both before and since the adoption of the present constitution, that the fact need not be averred in the indictment. *Jerry* v. *The State,* 1 Blackf. 395; *Dillon* v. *The State,* 9 Ind. 408; *Cordell* v. *The State,* 22 Ind. 1. The question also seems to be settled by the statute. The seventh clause of sec. 61, p. 404, 2 G. & H., provides that the indictment may not be quashed or set aside for any defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant upon the merits; and by section 62 it is further provided that, "neither presumptions of law, nor matters of which judicial notice is taken, need be stated in an indictment or information."

2. The court overruled a motion to strike out certain averments in the fourth count of the indictment as surplusage, which is also assigned as error. The averments were proper, as a part of the description of the injury inflicted, causing the death; the court did not therefore err

in refusing to strike them out. But if it had been irrelevant or surplus matter, the defendant could not have been prejudiced thereby; and therefore the judgment should not be reversed because of the refusal of the court to strike it out.

3. The next error complained of is the refusal of the Circuit Court to grant a change of venue, for the trial of the cause, prayed for by the defendant.

The motion of the defendant for a change of venue from *Tippecanoe* county was based on his own affidavit, stating that he believed he could not receive a fair trial in said county, owing to the prejudice against him therein. In addition to the reasons under the statute, stated in general terms, the affidavit stated further, "that said prejudice has manifested itself since the homicide for which he is indicted occurred, and before; since, in such expressions as "hang him," uttered by persons in the crowd the evening of his arrest, and remarks made since the commission of said homicide, by persons otherwise qualified to sit as jurors, that the defendant should be punished with death, if not for this offense, on account of offenses which such persons suspicioned him of committing, (of all knowledge of who did commit such offenses this affiant is ignorant,) or on account of something which such persons supposed he might commit hereafter; and before and since said homicide, for which this defendant is indicted, was committed, expressions have been used that, if this affiant were killed, a jury should not or ought not to be impanneled to try his murderers. This defendant further swears that prejudice against him existed before, and now exists after the commission of the alleged offense for which he stands indicted." The statute under which this motion was made provides that the court may, in its discretion, grant such change of venue. (2 G. & H. 407, sec. 78.) The application is addressed to the discretion of the court below. Allowing that a sound judicial discretion is meant thereby,

still the Circuit Court may be presumed to have a better opportunity to judge of the facts and propriety of the change than this court, looking only to the record. If this court can review the action of the court below in refusing such a change, the power should only be exercised in a clear case of abuse of that discretion. Such a case is not shown by the record before us.

4. During the impaneling of the jury to try the case, one *Ephraim Martin* was called into the box, and after being sworn to answer questions touching his competency to serve as such juror, testified as follows: "I reside six miles from *Lafayette;* I am not acquainted with the defendant; I have partly formed an opinion, as to the guilt or innocence of the defendant, from rumor, that might have some bearing on my mind. This would readily yield to the evidence, and I could give the man a fair trial; but I would rather not be on the jury." The defendant's counsel then asked the juror: "Is it on account of rumors you have heard that you object to sitting on the jury?" To which the juror answered: "Because I would rather not sit in such cases." The record then says: "Thereupon the defendant's counsel asked for a more definite answer, but the court overruled all further questions as to this point, and held the juror competent, and refused to allow a challenge for cause on his said statements;" to which the defendant excepted. The obvious meaning of the juror in the statement, "because I would rather not sit in such cases," was in reference to the charge of murder against the defendant, and that he did not like to serve as a juror in such cases.

The answer seems to be plain and definite, and the court only exercised a reasonable discretion in closing the examination on that point. The object of the question that elicited the answer evidently was to show that the juror feared the influence on his mind, in trying the issue, of the opinion partially formed from rumor as to the defendant's guilt or innocence; the answer gave a different reason, one

that did not tend to render him incompetent; it was therefore proper to close the examination on that point.

But it is insisted that the answer of the juror, that he had partly formed an opinion of the defendant's guilt or innocence from rumor, etc., rendered him incompetent, and that the court, therefore, erred in refusing the challenge for cause.

By the 13th section of the 1st article of the constitution of the state, it is provided that, "in all criminal prosecutions, the accused shall have the right to a public trial by an impartial jury," etc. And the statute enacts that "any juror is incompetent who has formed or expressed an opinion of the guilt or innocence of the defendant." 2 G. & H. 408, sec. 84.

The object of both the constitution and the statute is evidently to secure to the accused a fair and impartial trial, by unprejudiced jurors. The mind should be free from any previously formed positive conclusions, as to the guilt or innocence of the accused, or the material facts involved in the case; it should be in a condition to receive, judge of, and apply the evidence to the alleged facts, with the same freedom of will that would be presumed to exist if the juror had for the first time heard of the case in the jury-box. If from any previously formed opinion, it would require either *more* or *less* evidence to satisfy the mind of the existence or non-existence of the material facts involved, then the juror is not impartial, and is therefore incompetent. The commission of a crime of the character of the one charged in this case, naturally produces more or less excitement in the vicinity of its enactment, and with the various means of speedy communication existing almost every-where in this country, intelligence of the act is very soon generally disseminated throughout the immediate community, and it would in many cases be impossible to find a jury, composed of men of ordinary intelligence, who had never heard of the case before being called into the jury-box. It is often impossible to avoid

the formation of an opinion of some kind from mere hearsay or rumors. Such opinions, however, where the facts are only judged of by mere rumor, or the relation of persons not claiming to have any personal knowledge of them, would make but a slight impression on a mind of ordinary intelligence, and could scarcely form an impediment to a fair and proper conclusion from the legal evidence given on the trial. In this case the answer of the juror was, that he had partly formed an opinion from rumor, which would readily yield to the evidence. The question of his competency, under his statements, was left by the statute to the sound discretion of the court, and the facts do not show an abuse of that discretion in refusing the challenge for cause. See *Rice* v. *The State*, 7 Ind. 336. *Bradford* v. *The State*, 15 Ind. 347.

5. *James Rock* was called into the box as a juror; when under examination, under oath, as to his competency, the prosecuting attorney was permitted to ask him, over the objection of the defendant, if he entertained such conscientious opinions with regard to the infliction of the punishment of death, that, if the defendant was found guilty, he could not assess that punishment against him? To which he answered, "I do." The court thereupon allowed the challenge of the juror "for cause," over the defendant's objection. The court did right. This question was fully examined in the case of *Driskill* v. *The State*, 7 Ind. 338. We approve the rulings of the court on this point in that case.

6. During the progress of the trial, one *James Chizum* was introduced and sworn as a witness on the part of the defendant, and during his examination testified with reference to a particular act of violence by the deceased when intoxicated. The defendant's counsel then asked the witness this question: "Do you know the general character of the deceased, when he was intoxicated, from report of his neighbors?" The court refused to permit the question to be answered, which refusal is assigned as error. The

object of the question is very obscure, if at all perceptible. The *general* character of the deceased, whether sober or drunk, would seem to have little, if any thing, to do with the question of the defendant's guilt.   If the deceased was in the habit of becoming intoxicated, and when in that condition was quarrelsome and violent, and that fact was known to the defendant, and, if it is further claimed that the deceased was intoxicated at the time the defendant met him in the saloon, a short time before his death, and that the defendant's conduct on that occasion is claimed to have been influenced by a knowledge of the alleged violent habits of the deceased when so intoxicated, the question of such habits or disposition would seem to be one of *fact* rather than of general character.   The court did permit proof of the temper and disposition of the deceased, and of particular acts of violence when he was intoxicated; but if evidence of the general character of the deceased, when intoxicated, as to his being quarrelsome or violent, were permissible in such a case, still the question propounded to the witness was correctly overruled.   General character is the opinion, estimate, or knowledge of those residing in the neighborhood generally; but the question here propounded does not ask the witness if he has a personal knowledge of what that character is, as derived from the general opinion of the neighborhood, but if he knows the character "from report of his neighbors."   Besides, the question was not directed to any particular point of character, about which it could be at all material that the jury should be informed.

7. A witness was asked by the prosecution, " What the occupation of the defendant was?"   The defendant objected, but the court, over his objection, permitted the witness to answer the question, and to state the defendant's occupation.

There was nothing improper in the question, nor any thing very important elicited by the answer.

The remaining questions presented for the consideration of this court, relate to the instructions given by the court

below to the jury, and to the refusal of the court to give to the jury certain instructions asked by the defendant.

The propriety of the rulings and action of the court, in the instructions given to the jury, and in refusing instruction asked, must in a measure depend upon the evidence given in the cause. The instructions given should not only be a proper exposition of the law, but should be applicable to the facts and evidence of the particular case. The evidence in this case is made a part of the record; and we find that an examination of it is highly necessary to a proper understanding of the importance, propriety, and bearing of the charges given, and charges refused by the court. The evidence is so voluminous as to forbid the propriety of copying the whole of it into this opinion. The only part of it, however, material to the discussion of the questions involved, is that relating to the rencounter between the defendant and the deceased, which resulted in the death of the latter; and the circumstances immediately connected with it, which, in substance, is as follows:

*Jacob Keizer* testified, that on the evening of the 26th of *November*, 1864, being in the city of *Lafayette*, he passed up *Main* street at about nine o'clock, stopped in at the *Gem* saloon; noticed three men in the saloon, besides the barkeeper, *Dupleaux*. Two of them appeared to be in an altercation; knew none of the parties, except the *defendant*, and only knew him by sight. The first thing which drew my attention was the *deceased* telling the *defendant* to go away from him and let him alone, as he did not wish to have any thing to do with him; that he was not talking to him, (defendant,) but was talking to his brother, *Richard Fahnestock*. *Richard* told defendant not to interfere; to let them alone; that they would have no fight or no fuss. The defendant still kept himself between the two, saying something about that he would settle this thing himself, or words to that effect; he did not speak in a very audible voice. They moved up to the counter again, and *Clifford* again told the defendant to go away

and let him alone, that he did not wish to have any fuss with him. *Clifford* then stepped back from the counter, with both hands in his coat pockets, the skirt pockets; he had on a blouse coat. The defendant asked him if that was his game; if he was going to use weapons? *Clifford* told him that he had no weapons about him; that he never carried them; and again stepped up to the counter, leaning his left arm upon the counter, and again told defendant to go away from him and let him alone; that he did not wish to have any quarrel with him (defendant.) "I turned around to leave the saloon, and was going out, when I noticed the defendant pulling off his coat. Defendant said to *Clifford* that if he wanted any thing out of him (defendant) or with him, he (*Clifford*) could have it. Did not hear *Clifford* make any reply." Witness then passed out of saloon, and spoke to a gentleman on the pavement; told him there would be a fight in the saloon. Both then stepped to the door, and the gentleman said it was *Ed. Fahnestock* and some other person; witness did not hear the remark fully. The gentleman stepped away. Witness stood looking in the saloon, and saw defendant strike *Clifford*, knocking him out through the door. They were screen doors, opening either way, having no fastening; if any thing pushed against them, they would open. *Clifford* turned around, as if going away from the saloon; but, as the defendant came out of the door, *Clifford* turned around and walked up to him, and asked him if that was the way he done business—strike a man and then draw a revolver; and drew back his left hand and struck at defendant, who was standing still on the pavement; they closed together at once, the defendant drawing a revolver out of his pant's pocket, and commenced shooting at *Clifford;* thinks there were four shots fired while they were tussling on the pavement. After they got off the pavement into the street, *Clifford* was striking at the defendant. Noticed the defendant draw something from his side, or from behind him, and

strike three or four licks at *Clifford,* perhaps more; almost instantly *Clifford* called out that he was stabbed. The defendant then let go of him, and ran back into the saloon. *Clifford* staggered back on to the pavement, threw up his hands, and again called out that he was stabbed, and fell forward on the pavement. In two or three minutes afterward, some one said he was dead.

Does not think there could have been any scuffling in the saloon between the parties before the defendant struck *Clifford* and knocked him out at the door; thinks if there had been he would have seen it. The defendant followed *Clifford* right out after he struck him. The defendant had his hand in his right-hand pant's pocket when witness saw him standing on the pavement. When *Clifford* struck defendant, they clinched; *Clifford* had hold of defendant with his right hand somewhere about the shoulders or head. The defendant had hold of *Clifford* with his left hand, and kept shoving him back. The first shot was fired immediately in front of and close to the door. It was *Frank Terwelliger* witness spoke to at the door before the defendant struck *Clifford* in the house. The shots were fired about as fast as a man could cock his revolver and shoot. *Clifford* was moving back and the defendant following up. The defendant was doing nothing but shooting, and *Clifford* was striking at him. After the shooting was over, the defendant struck at *Clifford* underhand licks; thought he was punching with his revolver; this was before the defendant drew his knife. After it was drawn, the position of the parties, as near as witness could tell, was this: *Clifford* had his left arm on the defendant, with defendant's head bent down, and defendant was striking up with his right hand, and had hold of *Clifford* with his left hand, about the shoulder or breast, and was trying to shield his head from *Clifford's* blows. Thinks *Clifford* was sober. *Clifford* was considerably larger, and perhaps two inches taller, than *defendant.*

*John A. Haines* testifies that he was in the employ of
*Dupleaux & Davis* at the *Gem* saloon in *Lafayette;* was in
the kitchen of the saloon; heard loud words and quarrel-
ing; went to the sash door and looked through; saw *Clif-
ford* and *Richard Fahnestock* (defendant's brother) talking.
*Dupleaux* said, "Be still." *Clifford* said he was speaking to
defend himself; that he was fond of children, and had
picked up *Richard's* child and kissed it; he supposed he
had insulted *Richard's* wife by that. *Richard* told him that
was not it. *Clifford* said, "Why did you not strike me with
your fist, and not take a chair; it was a d—d cowardly act."
*Richard* said he did not think so, as he had to defend him-
self; and *Clifford* was drunk at the time he struck him
with the chair. Just then the *defendant* came in and
stepped between the two. The *defendant* and *Clifford* had
some words; what they were I could not tell. I then saw
the defendant pull off his coat and put it on the counter;
then Mr. *Dupleaux* said, "Not in here, *Fanny.*" He spoke
to him several times. They got to scuffling, and I could
not tell which struck first, until they got to the door; then
I saw the defendant with a small revolver in his hand and
knife at his back. *Clifford* said, "That's the way you are
coming to it, with a revolver." I heard the firing; right
after which the defendant came through the dining-room
saying, "Let me out." He was putting his coat on, or had
it in his hand. Thinks he heard *Clifford* in the saloon say
that "he was talking to his brother and not to him."
Heard defendant talk, but could not say what he said.
*Clifford* was talking loud. Do n't think he saw any scuffling
before the defendant pulled off his coat. Went back when
he saw the defendant near the door with the pistol, stand-
ing in the door or a little out. The knife was at his hip.
Thinks he might have been holding the door open. He
was holding the revolver down in his hand. The knife
was a large one. Went back once or twice while they
were fussing; came back to the sash door and saw the de-
fendant near the front door with the pistol. *Clifford*

seemed to be excited with liquor that evening. *Dupleaux* told him to quit talking so loud several times.

*Hugh Scudder* testified : Was not acquainted with *Clifford*, and had only had an introduction to the *defendant*. Is a cousin of *Richard Fahnestock's* wife. On the evening of the difficulty stepped into the *Gem* saloon with *Richard Fahnestock* and got something to drink; while there *Clifford* came in; *Richard* spoke to him first. *Clifford* then said, " Mr. *Fahnestock* I have been looking for you for some time." He then said he wanted to know why *Richard* had struck him with a chair some time before. *Richard* replied that he (*Clifford*) had imposed upon him, and abused him ; that he had taken a chair to take it into the shop, and struck *Clifford* because *Clifford* was trying to strike him. *Clifford* asked *Richard* why he struck him with a chair. *Richard* said because he had it in his hand, and thought *Clifford* was going to do him bodily injury. *Clifford* asked *Richard* why he did not strike him with his fist, and said it was a d—d cowardly act. *Richard* said he did not know whether it was or not. About this time the defendant came in and stepped between *Richard* and *Clifford*, and said something about having something to drink. Thinks he also said, " That 's enough of this," or something to that amount. *Clifford* stepped back and put his hand in his left coat pocket, and his right hand under his right coat tail, and said to the defendant " You go away, I am not talking to you." The defendant started up with his right hand toward *Clifford's* left pocket, saying what have you got there. Did not hear *Clifford* make any remark at all. Witness then walked toward the dining-room door, looked back over his shoulder, and saw defendant strike, or make a motion with his right hand, overhanded at *Clifford*. This was the last witness saw of them. Says, the defendant advanced toward *Clifford*, and the latter kept moving back. Do n't think the defendant got hold of *Clifford's* pocket ; saw no other striking. The defendant had his coat and hat on when talking, but had pulled his coat off when

witness was walking toward dining-room door.; did not
see him pull his coat off; he had it off at the door.    Had
been with *Richard* at *Matthias Scudder's*, where *Richard* re-
sides, and had come out with *Richard*, who at the request
of his wife got some cakes for over *Sunday*.    Had got the
cakes, and passing back by the saloon, *Richard* went in, at
the request of witness, to get something to drink.    *Clifford*
appeared to have something heavy in his coat pocket.
(The subsequent evidence explains this: *Clifford* had pur-
chased a pair of shoes for his little girl, and had them in
his coat pocket).    *Clifford* was the taller man, and larger
every way.

*Frank Terwilliger* testified, that he was tending bar at
*Bates & Ruby's*, *first* door *west* of *Gem* saloon.    About
nine o'clock, or a few minutes before, on the evening of
the killing, was standing in the door of *Bates & Ruby's*
saloon, with *Elwood Ruby*.    *Clifford* came up street, asked
witness if he had seen *Ed. Fahnestock* that evening.    Wit-
ness told him he had not.    He then said, "I do n't mean
*Ed. Fahnestock*, I mean *Dick Fahnestock*."    Witness told
him that he had not seen *Dick* that day.    Young *Ruby*
spoke and said, "*Dick Fahnestock* passed here while we
were talking."    *Clifford* asked where he went.    *Ruby* said,
"Up street."    *Clifford* then went into the *Gem* saloon.
A few minutes afterward the defendant came walking
down the street, and also went into the *Gem* saloon.
Soon afterward witness stepped to the door of the *Gem*
*Saloon*—two swinging doors; heard persons quarreling;
looked in, and saw *Dick* and *Ed. Fahnestock* and *Clifford*
talking; could not distinguish any words; started away
from the door, and some one spoke to him about a fuss
in there; started to walk up street, but turned and came
back; was going to *Gem* saloon; saw the defendant pull
off his coat and strike *Clifford;* the blow staggered him
through the screen door, nearly to the middle of the side-
walk; the defendant followed out, still having his coat
off.    *Clifford* asked defendant if that was his game, or if

that was what he wanted, or words to that effect. Witness do n't remember defendant's reply. *Clifford* squared off in the attitude of fighting; they apparently stepped toward each other. *Clifford* made an overhanded blow; do n't think he hit defendant; they then clinched; there was very little scuffling. When the first shot was fired, witness stepped back a little to avoid getting shot; while stepping back, the *second* and *third* shots were fired; they still struggled about three or four feet from the sidewalk, then came struggling back toward it. Saw the defendant strike three or four licks with his right hand at *Clifford;* he was close enough to hit; they were tightly clenched together. When they got about to edge of the sidewalk, they let go of each other, and *Clifford* halloed, " My God! I am cut!" thinks those were the words he used. *Clifford* fell on the sidewalk, and exclaimed, " O! O! O!" which was all he said. Thinks defendant was back in the saloon almost as soon as *Clifford* fell. When witness saw them in the saloon, *Clifford* was standing with his hands in his pocket; did not see *Clifford* make any demonstrations. During the fight out of doors, *Clifford* had defendant's head down below *Clifford's* breast; could not say how *defendant* had *Clifford;* he must have had hold of him to keep from falling; thinks the first shot was fired after the parties clinched.

*Gus. Fuss* testified, that his place of business is next door east of *Gem* saloon; keeps a meat shop; did not know *Clifford* before his death; was in his shop with *George Burrows;* heard a fuss, and both ran out. The first he saw was *Clifford* coming out of the room backward, the doors spread open. *Clifford* stopped about *three steps* from the door; heard a noise like a blow before he came out; he seemed to stumble out backward. The defendant followed. *Clifford* said, " I can give you a fair fight.' As quick as he said that, the defendant shot at him. Witness saw the pistol in his hand. *Clifford* then ran up to the defendant, and caught him by

the hair, and bent him down. Three more shots were
then fired, and then they backed off the sidewalk into the
street. *Clifford* kept the defendant down. The three last
shots were in quick succession, about a minute between
*first* and *second.* After the shots were fired, the defendant
drew a knife and commenced cutting. The first cut was
straight upward; the others upward and toward *Clifford.*
Witness then left; says he did not see *Clifford* do any
thing except bending defendant down; was about four or
five feet from them. The first shot was fired before
*Clifford* touched him; thinks not more than half a minute
elapsed before defendant drew the knife; the knife was
of a kind he did not have to open. After *Clifford* came
out he did not turn to walk away; he turned toward the
defendant, and said, "I can give you a fair fight." He
did not go toward or strike defendant before the first shot
was fired.

*George Burrows* testified: Was in *Fuss'* meat shop;
heard a fuss; went out and saw *Clifford* staggering back
on the sidewalk. Witness went into meat shop and set
his basket down, and then came out again. *Clifford* was
then near the edge of the sidewalk. The defendant came
out and said, "God damn, I can whip you at a fair fight."
Both then started for each other; did not see the pistol,
but supposed it was the defendant fired; they then
clinched, and immediately afterward there were three or
four more shots fired. They were still clinched after the
shooting, and the defendant was striking underhand
blows. After he had struck three or four licks, *Clifford*
said, "The God d—d son of," etc., "has stabbed me." The
defendant turned around, when witness for the first time
saw the knife. Up to this time the defendant's back had
been to the saloon, and *Clifford's* to the street; thinks the
defendant struck one lick with the knife after *Clifford*
exclaimed that he was stabbed. The defendant had
no coat on, and, witness thinks, no hat; *Clifford* had
on both coat and hat. Thinks the blade of the knife

probably six inches long. They were three paces apart when the first shot was fired; did not see defendant stop when he came out of the door; he spoke as he came out, and *Clifford* did the same, and they started for each other, and before they got together the first shot was fired; thinks neither had hold of the head of the other; thinks the shots were fired faster than a man could cock a pistol.

*Daniel Ross* testified, that he knew the defendant, also knew *Clifford* by sight. On the evening of the killing was in *Bates & Ruby's* saloon about nine o'clock; stepped out of the door, and saw a difficulty on the sidewalk. The defendant was standing by the door, *Clifford* further out. Saw *Clifford* making toward *defendant*, and strike at him; thinks he did not hit him; then there was a pistol shot fired by defendant; then they clinched; defendant fired another shot, and then a third. They were then in the street, and the crowd prevented witness from seeing more. Saw no striking, except the first blow by *Clifford*, and thinks they must have had each other by the collar, or somewhere there. They must have been four or five feet apart when the first shot was fired; says *Clifford* struck before the first shot was fired, but thinks defendant dodged the blow.

*Chris. Mertz* testified, that he keeps a provision store *three* doors east of the *Gem* saloon. His attention was first drawn by the first pistol fire; was standing in the door at the time. The first pistol shot was fired on the sidewalk. Witness first saw the parties just as they got off the sidewalk, *Clifford* first and the defendant after him; they then stood before each other, about two feet apart. The defendant shot at *Clifford* pretty rapidly after they got off the sidewalk. They were about six feet from the sidewalk when the last shot was fired, and almost as close together as they could get. Saw defendant put back his right hand and draw a little nearer to *Clifford*, and as witness thought stabbed him. They came closer together,

both in a bending position; it looked to witness as though defendant had *Clifford* by the neck-tie.

Do n't recollect that they had hold of each other when witness first saw them. *Clifford* stood in the gutter and the defendant just getting off the sidewalk, and were about two feet apart. *Clifford* went back faster than the defendant advanced; they were stooped, and had no hold of each other that witness saw.

There were two breadths of store room and ten feet of sidewalk between them and witness. They were not much stooped; the defendant stooped the most. *Clifford* was the taller, and stood pretty straight up. Does not think that *Clifford* had hold of defendant when the latter reached for the knife; does not think that *Clifford* had hold of the defendant at all. *Clifford* was the taller, the defendant probably the better built man.

*Richard T. Fahnestock*, brother of the defendant, and called as a witness for the defense, testified that he was engaged in *Scudder's* furniture rooms; that the last of *August*, or early in the fall of 1864, *Clifford* came in front of the furniture room, just before dusk, in the evening; he was quite intoxicated, and had some words with one *Jenners*, who was sitting there; he struck at *Jenners* a dangerous blow; *Jenners* ran across the street. *Clifford* said something about clearing him out; then stepped into the door of the shop, and took hold of witness' arm, and gripped it tightly; witness pushed his hand off. He then wanted to go into the store, but witness advised him to remain on the sidewalk, where a pleasant breeze was blowing that would refresh him. *Clifford* then sat down on a chair outside of but near the door, and sat there some time. Witness wanted to take in the chairs with a view of closing up the shop, and took them all in but the one on which *Clifford* was sitting. He then went to *Clifford* and asked him for the chair, and told him that he wanted to take it in. *Clifford* refused to give it up, using very coarse and indecorous language. Witness repeated the request rather

coaxingly a time or two, but *Clifford* still refused, using in his refusal coarse and profane language; finally the witness took hold of the chair (which was a wood-bottomed one) and turned *Clifford* out of it.

Witness then went into the furniture room with the chair, and when he had reached the place to deposit it, he heard a heavy step behind him, turned around, and saw *Clifford* with his hands drawn back in the act of striking him; saw he was very much the larger man, and without time to think, witness drew the chair and struck *Clifford* with it. *Clifford* fell on the floor. Witness then went and brought the marshal; on his return to the room he found quite a crowd collected. They had a light and were examining *Clifford*. There was quite a cut over the eye where the chair struck him, and witness then saw he had hurt him seriously, and went for a physician; met his brother, *Warren Fahnestock*, who had had some experience. Witness directed him to dress the wound, which he did. Witness then sent *Clifford* home in a wagon, under charge of *Warren*, who was directed to pay all charges, and tell *Clifford's* family that he (witness) had struck him, and would do all he could for them.

The witness further testifies, that near nine o'clock, on the evening of the 26th of *November*, 1864, he went, in company with *Hugh Scudder*, to *Ruger's* to buy some cakes. Got the cakes, and on their return they had to pass by the *Gem* saloon. When they got to the saloon, at *Scudder's* request, they went in to get something to drink.

Thinks a young man by the name of *Lutz* was in the saloon when they went in, but thinks he went out before they got their drinks. After drinking, they turned to go out. When he turned round, he saw *Clifford* standing behind him; had not seen him before since he struck him with the chair. Witness said, "How are you, *Clifford?*" and extended his hand. *Clifford* refused to shake hands, but said he had been looking for witness. Witness asked what for. *Clifford* then said he wanted to know what witness

had struck him for; said he had been told that the reason was because he had insulted witness' wife and kissed his baby. Witness told him "that was not it," and then related to him the whole occurrence. *Clifford* then asked why witness did not hit him with his fist, and why he struck him with a chair. Witness replied that he had the chair in his hand, and thought he (*Clifford*) was going to do him an injury, and had struck him without having time to think; that he had hurt him more than he wished to, and had done every thing he could to make him comfortable afterward. *Clifford* said it was a d—d cowardly act. Witness replied he thought not, under the circumstances, etc. *Clifford* made some reply. At that time the defendant stepped into the saloon. Witness turned to see who it was. *Scudder* stood nearest the door, *Clifford* between *Scudder* and witness, and between two and three feet from witness, all against the counter. The *defendant* walked up to the counter, between *Clifford* and witness, and, speaking to *Dupleaux*, said, "*Tom*, give me a drink." *Clifford* reached out his right hand, took him by the shoulder, and pushed, or rather pulled, him back. The defendant stepped up again and called for a drink; as he stepped up, he said to *Clifford*, "What do you want?" Witness thinks he (witness) said to defendant, "Pay no attention to him;" that he was under the influence of liquor. *Clifford* pulled him back the second time, and said, "Go away," or something of that kind. The defendant then shoved him away from him, and again said, "What do you want with me?" Defendant stepped up to the counter, and as he did so, turned his head over his left shoulder, looking toward *Clifford*, who was in the act of moving his left hand down in his coat pocket, and thrust his right hand under his coat tail. The defendant turned from the counter, and reached his right hand toward *Clifford's* pocket, and asked *Clifford* what he had there, and tried to feel the coat pocket. *Clifford* advanced his right hand and shoved him away, and made a motion with his left hand. "I don't think he

struck him." Defendant dodged out of the way, then stepped back quickly, drew his coat off, threw it on the counter, and said, "Now if you want any thing of me you can have it." *Clifford* walked toward defendant, putting his left hand in his pocket. Defendant struck him and pushed him at the same time. *Clifford* said, as he approached, "Yes, I do, God d—n you," or "d—n you;" is not positive which. Defendant struck him on the breast close under the chin. *Clifford* staggered back so that he struck the dividing doors and went out. The defendant followed him close up, as witness supposed, to strike him; both went out, and witness followed immediately. As the door swung inward, witness grasped one side, and looked out; the defendant was standing just outside, *Clifford* west of him, saw *Clifford* draw his left hand out of his pocket, and come toward defendant, and make a blow at him. Defendant stepped back. *Clifford* grasped him by the hair, as witness thinks; might have grasped him by the collar just back of the neck. As soon as he caught defendant he struck him an overhanded blow. The defendant then drew his revolver, and fired one shot at *Clifford.* Thinks it did not take effect. "*Ed. then jerked his head from side to side as if trying to get loose.*" There was a kind of struggle. They got toward the edge of the sidewalk, going in a south-westerly direction. *Clifford* had him with his right hand, holding him down, and striking at him with his left; they scuffled out into the street, four, five, or six feet from the sidewalk. The defendant then cocked his revolver, and repeated until he fired three shots. *Clifford* had him bent down all the time, and was striking him; had him in that position when they backed off the sidewalk; there was a mutual struggle.

The last three shots were fired in rapid succession. The defendant then threw his revolver down, and drew his knife. They stood in the same position; the knife seemed to make fruitless lunges. *Clifford* let go of him, and said, "He has stabbed me," or "I am stabbed." The defendant

immediately left him.  The defendant "was in the habit of carrying this little pistol and a knife."  Witness went into the saloon, saw the defendant put on his coat, and disappear.  Witness picked up the pistol where defendant had dropped it, and gave it to him when he went back into the saloon; had not seen the defendant that day before he came into the saloon.

*Tom Dupleaux* testified, that he was the keeper of the *Gem* saloon in *Lafayette;* was in the saloon on the evening of the 26th of *November,* 1864.  That between half after eight and nine o'clock in the evening, *Richard Fahnestock* and *Scudder* came into the saloon and "got a drink."  After which witness was speaking to *Richard,* when *Clifford* came in.  Witness did not see him until he got close to *Richard.*  *Clifford* spoke to *Richard,* after which witness did not see *Scudder.*

*Clifford* appeared very angry; they commenced talking about a previous difficulty.  Witness was not paying special attention to their conversation, but heard *Clifford* say to *Richard,* "If you had struck me with your fist, I would n't cared a damn; when you struck me with a chair, I think it a d—d cowardly act."  *Richard* tried to coax him down, and repeated to him to let it drop; but the more he tried to do so, the worse *Clifford* got.

Just then the defendant came in and walked between the two, who were standing about two feet a part; witness was behind the counter in front of them.

*Clifford* pushed the defendant back, and told him to stand aside; it was none of his fight, or none of his business.  Witness told *Clifford* that he would have no fuss in the house; it was the first time *Clifford* had been there.  Witness did not hear the *defendant* call for any thing to drink.  Defendant asked *Clifford,* "What do you want with me?"  *Clifford* put his hand in his side pocket.  Did not notice *Clifford* push him back twice.  *Clifford* extended one hand and said, "You son of a bitch, I do."  Thinks he knocked defendant's hat off; the defendant jumped

from under him, took off his coat, threw it on the counter, and knocked *Clifford* out of the door before witness could get round from behind the counter. Thinks they struggled together. Defendant struck him about the breast.

Before witness got around the counter, they were all out of doors. Witness was going out, but just then two strangers came in and called for " *Tom-and-Jerries*," and he remained to wait on them.

Witness heard three shots fired, and then ran immediately to the door. Just as he got to the door, the *man* said, I'll lick you any way. The defendant shot; " the shot took effect in the belly." The defendant was not a foot from *Clifford*.

Witness stood on the sidewalk, but saw the parties in no position at all; they were not more than a foot apart, and did not have hold of each other at the time. Witness was excited, and ran into the saloon.

On cross examination, the witness testified that he thought *Clifford* wanted to have a fight with *Richard Fahnestock*; he shoved the defendant back and said, "Its none of your business," and *Richard* said that he and *Clifford* would settle it, and seemed to dissuade both the parties. Thinks *Clifford* was slightly inebriated when he came into the saloon. " He was boisterous; seemed very angry; wanted a fuss."

*Edward Ruby* testified that he was at the door of *Bates & Ruby's* saloon talking with *Terwilliger;* *Clifford* came up and asked *Terwilliger* if he had seen *Ed. Fahnestock*, then said it was not *Ed.* but *Dick*, he was looking for. Witness told him he had seen *Dick* pass up a minute before. *Clifford* went up in the direction of the *Gem* saloon. In a few minutes afterward witness heard the contest; heard a scuffle; saw defendant pull off his coat and strike *Clifford*. When the defendant came out, *Clifford* was near the door of *Bates & Ruby's* saloon. *Clifford* squared off and came up to the defendant and struck at him; could not see whether he hit him or not. They clinched, then

the firing commenced. They scuffled on the sidewalk, and went into the street. They had hold of each other, but could not say how. Thinks *Clifford* was stooping; thinks they had hold all the time of the firing, but would not say positively. Saw *Clifford* strike several times at defendant. On cross examination, the witness said that *Clifford* struck with his left hand overhand blows. Would not say certain which was first, the clinching or the firing. The shots came quickly. Saw the defendant draw his knife and stab *Clifford*, and heard the latter cry out. *Clifford* came out of the door backward.

Several other witnesses were examined, who testified to having seen part of the fatal affray; but, being at some distance from the parties, their opportunities for correct observation were much less than of others whose testimony we have given. Besides, they testify to no facts not fully covered by the evidence of the other witnesses. It is not therefore, deemed necessary to extend this opinion by copying further from the evidence.

*Clifford* died almost immediately after he was stabbed. A *post mortem* examination was made, and several physicians who participated in it testified that one of the strokes with the knife penetrated his heart, causing almost instant death.

An effort was made on the trial by the prosecution to prove that the defendant, a short time before he entered the *Gem* saloon, had threatened to kill *Clifford*, for the purpose of showing premeditated malice. Mrs. *Elmira Robinson* testified that she knew the defendant by sight; that she was standing in the door of *Sumalt & Fuss'* shop, between eight and nine o'clock the evening that *Clifford* was killed; that while there the defendant, and some other man, whom she did not know, passed by, going west, and she heard the defendant say to the man walking with him, "I will kill him, God d—n him." She had no knowledge to whom he alluded, and he did not mention any person's name. There was no evidence of any previous quarrel, or

difficulty of any kind between the defendant and *Clifford*, nor was there any other evidence that the defendant had ever threatened to injure *Clifford*, or in any manner showing that the remark testified to by Mrs. *Robinson* related to him; but, on the contrary, evidence was given on behalf of the defense tending at least to show that the remark had no reference to *Clifford*. *Edward Walke* testified that he met the *defendant* at about *seven* o'clock on the evening of the 26th of *November* last, at the new drug store; that they passed together down *Main* street, around the square, and about the time they passed the meat shop of *Sumalt & Fuss*, the *defendant* said to the witness, "If you do n't stop your lying I will kill you." That at the same time he (witness) saw a woman standing in the meat shop; that the remark was made to witness in jest. The defendant said nothing about *Clifford*. The witness says he remained with the defendant until fifteen minutes past eight. There is a discrepancy between the statement of this witness and that of Mrs. *Robinson*, as to time. Mrs. *Robinson* says the defendant passed the meat shop in company with another person between eight and nine o'clock in the evening, when he made the remark or threat testified to by her; while *Walke* fixes the time at a little after seven, when he passed the same place in company with the defendant. Nothing is more difficult of recollection, with accuracy, than the precise time of events, which in other respects may remain fresh in the memory. It would be rather remarkable that the *defendant* should, in walking the streets and passing the same point twice, with an hour intervening, make at each time, and at the same place, substantially the same remark, of the character indicated by the witnesses. The more reasonable inference is, that one or the other was mistaken in the time fixed, and possibly both. Neither of them may have recollected the *time* correctly, and yet both refer to the same event; but the statement of Mrs. *Robinson*, unexplained, would leave the threat uttered by the defendant to apply to any other person as readily as to *Clifford*. It

was too indefinite to justify any inference in the case against the defendant, or in any manner to influence the charge of the court or the verdict of the jury, and the presumption is that it did not.

*Warren Fahnestock,* brother of the defendant, testified that he took *Clifford* home on the night that *Richard Fahnestock* struck him with a chair at the furniture store; that after *Clifford* got home he said, "D—d if I do n't have revenge on the whole family;" that he communicated the threat to the defendant on the *Sunday* following.

There was nothing in the evidence to show that *Clifford* had ever repeated the threat afterward, or exhibited any ill-will toward any member of the family except *Richard;* and, as to him, only at the time he met him in the *Gem* saloon. Looking to the time when, and the circumstances under which, this threat is said to have been made, it would seem to be entitled to but little weight in determining the character or degree of the defendant's offense in the case at bar. If the defendant was apprehensive that *Clifford* would attempt to carry the alleged threat into execution, especially as to himself, it might well have placed him on his guard, and dictated proper caution against giving to *Clifford* any new cause of offense, or pretext to carry the threat into execution. It could not justify him in seeking a quarrel with *Clifford,* nor in the use of deadly weapons, if at the time of the conflict he was not in danger of great bodily harm.

The evidence in the case, it is presumed, has been stated with sufficient fullness to determine the correctness and propriety of the instructions given by the court to the jury, and also of those asked by the defendant's counsel, and refused by the court, of which the defendant's counsel complain.

The refusal of the court to give certain instructions asked by defendant, will be first considered.

The court was asked, but refused, to give the following instruction:

"1. If the jury believe, from the evidence, that the defendant killed the deceased, when there was reasonable apprehension on his part that the deceased was about to inflict upon him great bodily harm, then you should acquit the defendant." The court refused to give this charge, but had already instructed the jury as follows:

"If one person unlawfully attacks another, the person so attacked may repel force by force; he may use as much force as he may reasonably think is necessary to repel the attack, and if the party be in imminent danger of life, or of receiving considerable personal harm, or if the party may reasonably believe, under the circumstances, that he can not avoid danger of life or great personal harm in any other way, in such case he may lawfully take the life of his assailant. In other words, a man may lawfully defend himself, and return blow for blow, but he can not lawfully do more than he may reasonably think is necessary for his own defense."

This instruction is quite as favorable to the defendant, as to the question of excusable homicide on the ground of self-defense, as the law or the evidence in the case would justify.

The instruction asked was properly refused for another reason. It assumes too much; as a proposition of law it is too broadly stated, without qualification, to be justified by authority. It justifies the slayer in killing his antagonist, no matter what the circumstances may be, whenever he has reason to believe that his antagonist is about to inflict upon him great bodily harm, and that, too, without regard to the question as to who makes the first assault, or the character of the weapon with which it is made. If, in the case at bar, the defendant, without provocation, had assailed *Clifford* with a deadly weapon, and *Clifford*, in his own defense, had drawn a weapon, and was about to inflict great bodily harm on the defendant, the latter, under the instruction asked, would have been justified in instantly killing him. The instruction asked is not law, and the court therefore correctly refused to give it.

VOL. XXIII.—17

2. The defendant's counsel moved the court to instruct the jury thus: "In the case of excusable self-defense, the first assault in a sudden affray, all malice apart, will make no difference, if the prisoner quit the combat and retreated, or attempted to retreat, (if he was so situated that he could not retreat), before the mortal wound is given;" which the court refused to give.

It is not necessary to discuss the correctness of this instruction as an abstract proposition, as it was correctly refused for another reason.   There was no evidence in the case to support it.   Without discussing here the question as to how, or by whom, the combat was commenced in the saloon, all the witnesses present concur in the fact that the defendant struck *Clifford*, and knocked him out at the door, and that the defendant immediately followed him out.   There is a conflict in the evidence as to which did the first act outside of the house; but all the witnesses who testify on the point concur in the fact that it commenced almost immediately after they were out of the house, and that the defendant did not, at least, exhibit any unwillingness to engage in it.   They also agree in the fact that from the time it did commence until its fatal termination in the death of *Clifford*, the parties, whether clinched or not, were constantly engaged in a close and desperate struggle, the defendant firing three or four shots with a revolver, and then using vigorously a large knife until he had slain *Clifford*.   No fact is testified to by any witness from which the reasonable inference could be drawn that the defendant either made an effort to retreat, or desired to do so.   The defendant's counsel refer to the evidence of *Richard Fahnestock* for the statement on which the instruction is based.   The witness referred to, after stating that the parties were clinched, and that *Clifford* struck the defendant an overhanded blow, whereupon the defendant drew his revolver and fired at *Clifford*, made this statement, "*Ed. then jerked his head from side to side, as if trying to get loose;* there was a kind of

struggle." The same witness, in describing the scene immediately afterward, says, *"there was a mutual struggle."* It is difficult to perceive how this statement can be made to prove a desire or intention on the part of the defendant to quit the combat and retreat. The witness thought that *Clifford* had hold of the defendant by the head or neck, and was bending him down, while the defendant was firing with his revolver. It was natural, under the circumstances, that *Clifford* should exert his utmost power to prevent the defendant from shooting him, and in their *"mutual struggle"* the defendant *"jerked his head from side to side,"* to break the force of *Clifford's* effort. The giving of the instruction asked, under the facts in evidence, could only have tended to mislead the jury, and it was therefore correctly refused.

3. "A reasonable doubt as to any material ingredient necessary to constitute a crime must be solved in favor of the defendant; and if the jury, from the evidence, entertain reasonable doubts as to the fact whether the defendant did or did not attempt to retire from the contest, in good faith, before the mortal wounds were given, then those doubts must result in his favor, and the jury must find a verdict which would be warranted by the fact that he did so attempt to retire."

The court refused so to instruct the jury. The first branch of the charge, relating to the doctrine of doubts, was fully covered by the general charge of the court. The latter branch is in substance the same as the second instruction asked, and the reasons given why it was correctly refused apply with equal force to the proposition contained in the third.

In reference to the instructions given by the court to the jury, it is deemed both proper and just to the learned judge who presided at the trial, to say that they are full, clear, applicable to the facts of the case, and in the main correct. They were severally excepted to by the defendant's counsel at the trial. Objections are urged to only

three of them in this court, which renders it unnecessary that we should specially notice the others.

The following are the instructions referred to:

1. "As already hinted, the killing must have been done purposely, and with premeditated malice, to constitute the party guilty of murder in the first degree. It is proper to say that the law fixes no length of time. If the person has actually formed the purpose maliciously to kill, and deliberated and premeditated upon it before he performs the act, he is guilty of murder in the first degree, however short the time may have been between the purpose and its execution. It is not time that constitutes the distinctive difference between murder in the first degree and murder in the second degree, but the actual existence of such a purpose. Malice, deliberation, and premeditation constitute the crime of murder in the first degree. It matters not how short the time, if the party has turned it over in his mind, weighed and deliberated upon it."

2. "If the jury believe from the evidence that the defendant engaged in a quarrel with the deceased, and knocked him out of the door of the saloon with his fist, and then followed him up, and afterward, without being in any danger of great bodily harm, drew a pistol, and with premeditation fired several shots, and then drew a knife and gave several fatal stabs, with the purpose to kill, then the killing would be murder in the first degree."

3. "If the defendant sought a quarrel with *Clifford*, and first struck him a violent blow with his fist, knocking him out of the door of the saloon, in the expectation that *Clifford* would resent the blow, and in his turn attack the defendant, so that he might have an excuse to shoot and stab the deceased, and thereby take his life, and in accordance with such expectation, even if *Clifford* did thereupon attack the defendant with his fist, and the defendant then shot and stabbed him as charged, then the killing would be murder in the first degree."

These charges were not numbered in the record; they are numbered here for convenience in reference.

The *first* charge, as it is understood by this court, seems to be a fair exposition of the law, and is applicable to the evidence in the case, leaving the facts to be determined by the jury. It asserts that, to constitute murder in the first degree, the killing must have been done purposely and with *premeditated* malice. This accords with the statutory definition of the crime. It also asserts that the law fixes no length of time prior to the act that it should be premeditated and determined upon, but again asserts that it must be so premeditated—that is, thought of, deliberated, and determined upon—before the act is committed. This question will be further considered in the discussion of the second instruction.

The second instruction seems to assert a different principle which, if true, would in effect abolish all intelligent distinction between murder in the first degree and murder in the second degree. The wording of the instruction renders its meaning somewhat obscure. It is understood to assert that, if the defendant was engaged in a fist fight with the deceased, and while so engaged, and not being in danger of great bodily harm, drew a pistol, and with premeditation fired several shots, and then drew a knife and gave several stabs with the purpose to kill, such killing would be murder in the first degree.

Our statute has divided murder into two degrees. *Malice* and a *purpose to kill*, are necessary ingredients to render the killing murder in either degree; but to constitute murder in the *first* degree, it is requisite that there should exist not only malice and the purpose to kill, but such purpose must be *premeditated*, or, in the language of the statute, it must be done "purposely and with premeditated malice." It must be inferred that the legislature intended to draw a clear and comprehensible distinction between the two degrees, and to make murder in the first degree the higher crime, involving a higher degree of

malignity, and therefore provided that it might be punished with death; while the penalty for murder in the second degree, is imprisonment for life in the state prison.

Under the statute of 1843, this court held, in the case of *Finn* v. *The State*, 5 Ind. 400, that an indictment, charging the killing to have been done with "*malice aforethought*," only charged an offense of murder in the second degree. The reason given is, that "malice aforethought" does not necessarily require deliberation and premeditation. The court referred to the celebrated case of Dr. *Webster*, 5 Cush. 316, in which *Shaw*, Ch. J., in his charge to the jury, said: "It is not the less malice aforethought, within the meaning of the law, because the act is done suddenly, after the intention to commit the homicide is formed; it is sufficient that the malicious intention precedes and accompanies the act of homicide. It is manifest, therefore, that the words malice aforethought, in the discription of murder, *do not imply deliberation*, or the lapse of considerable time between the malicious intent to take life and the actual execution of the intent, but rather denote *purpose* and *design*, in contradistinction to accident and mischance."

In *Beauchamp* v. *The State*, 6 Blackf. 299, it is said, "to constitute malice aforethought, it was' only necessary there should be a formed design to kill, and that such design might be conceived the moment the fatal stroke was given, as well as long before; that malice aforethought means the intention to kill." Our statute, in defining murder in the second degree, uses the words *purposely* and maliciously. *Purposely* here means intentionally and designedly; and therefore, to make the act murder in the second degree, the intention or design, the purpose to perpetrate it, must be formed before the act is committed.

But to render the act murder in the first degree, something more than the purpose or intention to commit it is requisite; the purpose must be *premeditated*. *Webster*

defines *premeditate* thus : "1. To think, consider, or revolve in the mind beforehand; to deliberate; to have formed in the mind by previous thought or meditation. 2. Previously contrived, designed, or intended; deliberate, as premeditated murder." The *principle* involved, by which murder in the first degree is distinguished from murder in the second degree, is this: In the former, premeditated malice requires that there should be time and opportunity for deliberate thought; and that, after the mind conceives the thought of taking the life, the conception is meditated upon, and a deliberate determination formed to do the act; that being done, then no difference how soon afterward the fatal resolve is carried into execution, it is murder in the first degree.

While, in murder in the second degree, the purpose or intention to kill is followed immediately by the act, it is not premeditated; the time and circumstances are not such as to allow of deliberate thought; yet to make it murder, even in the second degree, there must be a formed design and purpose to kill.

In the case at bar, the instruction under consideration asserts the principle that, if the purpose to kill was formed in the midst of the conflict, and followed immediately afterward by the fatal acts that destroyed the life of the deceased, it would be murder in the first degree. The court, it is true, said it must be premeditated; but the hypothetical facts, upon which the assertion is based, would give no time or opportunity for premeditation or deliberate determination, by thought and deliberate reflection. It does not seem to contain a fair interpretation of the meaning of the statute defining the crime, and under the facts of the case might readily have misled the jury, and should not have been given.

The third instruction is hypothecated on an assumed state of facts, and is a proper enunciation of the law on the facts assumed. It asserts that if the defendant sought the quarrel with *Clifford* for the purpose of provoking him

into an assault, as an excuse to take his life, and did so, it would be murder in the first degree. There was evidence tending reasonably to prove the facts on which the instruction is hypothecated, and it was therefore proper to so instruct the jury. But there was also evidence strongly tending to rebut the presumption of any *premeditated intent* on the part of the defendant to take the life of *Clifford*, which, if believed by the jury, should have reduced the crime to murder in the second degree. In this connection, it is proper to say that the record discloses the fact, that the cause was tried very soon after the offense was committed, and in the midst of a highly excited community; thereby rendering it the more important that the defendant should have the benefit of a full and clear exposition of the law on every point, arising on the evidence in the case, in his favor. The court then, while properly instructing the jury upon the one hypothesis arising from the evidence against the defendant, should also have given another charge on the other one in his favor, as reducing the crime from murder in the *first* to murder in the *second* degree.

Another fact presented by the record was perhaps unfortunate to the defendant. The case seems to have been pressed by the prosecution as one of murder in the first degree, while, on the part of the defense, it appears to have been insisted, with equal pertinacity, that the killing was, under the facts of the case, in self-defense, and therefore excusable homicide. · These two extremes, if they may be called such, seem to have been kept prominently before both the court and jury, while the middle ground was left unexplored, and the principles of law springing therefrom were not fully elucidated. No instructions as to such questions were asked by the defendant's counsel, nor, as we think, fully presented in the general charge of the court.

For the reasons stated, we think a new trial should have been granted.

Judgment reversed, and a new trial awarded.

*John M. La Rue, Pettit & Son,* and *R. P. Davidson* and *R. P. De Hart,* for appellant.

*F. B. Everett* and *Chase & Wilstach,* for the state.