STATE v. WILLIAM WILLIAMS.[1]

December 8, 1905.

Nos. 14,459—(21).

**Criminal Law—Seclusion of Jury.**

This is an appeal from an order denying the defendant's motion for a new trial after his conviction of the crime of murder. *Held*, whether the jury in a capital case should be permitted to separate during the trial and before the final submission of the case is a matter within the sound discretion of the trial court. The discretion was not abused in this case.

**Evidence.**

A statement to the effect that the defendant shot the deceased and herself made by a party other than the deceased, but who was mortally wounded at the time of the homicide, and made in close connection with the event and under circumstances precluding any suspicion of fabrication, was properly received in evidence.

**New Trial.**

If substantial error is committed on the trial of a defendant in a criminal case, it will be ground for a new trial, unless it appears that the defendant could not have been prejudiced thereby; but, if it affirmatively appears from the whole record that the defendant could not have been prejudiced by the error, it is not a ground for a new trial.

[1] Reported in 105 N. W. 265.

**Misconduct of Jury.**

· Rule applied, and *held*, that the fact that some of the jurors during the trial read certain newspaper articles in reference to the defendant and his trial was not prejudicial error.

Appeal by defendant from an order of the district court for Ramsey county, Olin B. Lewis, J., denying a motion for a new trial, after a trial and conviction of the crime of murder in the first degree. Affirmed.

*James Cormican* and *Francis H. Clarke,* for appellant.

If by proper·affidavits it appeared that the newspaper articles were published and the jury were not under restraint, the court should presume that they read such articles. Meyer v. Cadwalader, 49 Fed. 32; Clyde Mattox v. United States, 146 U. S. 140, 149. The theory of jury trials is that all information about the case must have been furnished in open court, where the judge can separate the legal from the illegal evidence and where the parties can explain or rebut. Aldrich v. Wetmore, 52 Minn. 164; Mattox v. United States, supra; Rush v. St. Paul City Ry. Co., 70 Minn. 5.

The court erred in admitting the evidence of Mrs. Kline as to the statement made to her by Mrs. Keller. The only ground upon which it was offered was that it was a part of the res gestæ. There was no foundation laid for admitting it. It was hearsay and was not made by the deceased before he died. What Mrs. Keller based her statement upon does not appear. She does not say she saw defendant shoot the boy nearly dead. She does not say she saw defendant shoot her. Perhaps it was only a conclusion of her mind. Perhaps her judgment was misinformed. So long a time had elapsed that she may have sought to avoid the consequence of her own act by trying to place it upon defendant. The courts of last resort have seldom approved the admission of evidence of this character from a bystander or even a participant under such circumstances. State v. Gallehugh, 89 Minn. 212; Binns v. State. 57 Ind. 46; Jones v. State, 71 Ind. 66; State v. Petty, 21 Kan. 54; State v. Pomeroy, 25 Kan. 349; State v. Maitremme, 14 La. An. 830; Hays v. State, 40 Md. 633; State v. Brown, 64 Mo. 367; People v. Davis,. 56 N. Y. 95; State v. Davidson, 30 Vt. 377.

*Thomas R. Kane, County Attorney,* and *O. H. O'Neill,* Assistant County Attorney, for the State.

The appellant has no legal ground upon which to rest his contention that the court abused its discretion in allowing the jury to separate and disperse at the end of the morning and afternoon sessions during the trial. Bilansky v. State, 3 Minn. 313 (427); State v. Ryan, 13 Minn. 343, 370; Stephens v. People, 19 N. Y. 549; King v. Woolf, 1 Chitty, 401; Bebee v. People, 5 Hill, 32; Davis v. State, 15 Ohio, 72; State v. Way, 38 S. C. 333; Stewart v. State, 31 Tex. Crim. 153; Ogle v. State, 16 Tex. App. 316.

The reading of the newspapers by the jury, as alleged by appellant, is not sufficient ground for setting aside the verdict of the jury, and granting a new trial. United States v. Reid, 12 How. 361; Commonwealth v. Chauncey, 2 Ashm. (Pa.) 90; Bulliner v. People, 95 Ill. 394; State v. Jackson, 9 Mont. 508; People v. Leary, 105 Cal. 486; Williams v. State, 33 Tex. Crim. 128; Moore v. State, 36 Tex. Crim. 88.

The court did not err in receiving the testimony of Mrs. Kline relative to the statement made to her by Mrs. Kelly concerning the manner in which the homicide occurred. State v. Horan, 32 Minn. 394; Commonwealth v. McPike, 3 Cush. 181; Commonwealth v. Hackett, 2 Allen, 136; Rex v. Foster, 6 Car. & P. 325; Landers v. People, 104 Ill. 248; Insurance Co. v. Mosley, 8 Wall. 397; People v. Vernon, 35 Cal. 49; Kirby v. Commonwealth, 77 Va. 681; People v. Simpson, 48 Mich. 474; State v. Sexton, 147 Mo. 89; State v. Walker, 78 Mo. 380; Wharton, Crim. Ev. §§ 262, 263; Abbott, Trial Brief, Crim. Causes, § 628, and authorities cited.

**START, C. J.**

The defendant, William Williams, on May 19, 1905, was convicted in the district court of the county of Ramsey of the crime of murder in the first degree upon an indictment charging him with having, on April 12, 1905, killed John Keller by shooting him with the premeditated design to effect his death. On June 30, 1905, the court made its order denying the defendant's motion for a new trial, and he appealed from the order.

While the defendant's assignments of error do not challenge the sufficiency of the evidence to sustain the verdict of the jury, yet a brief

statement of the admitted facts of the case and of the evidence are essential to a proper consideration of the assignments of error relied upon by the defendant for a reversal of the order.

The defendant at the time of the homicide was twenty-eight years old. He was born at St. Ives, Cornwall, England, and came to this country some eight years ago, and up to the time of his arrest he had worked at various places as a laborer, miner, and steamfitter. In June, 1903, in the city hospital of St. Paul he made the acquaintance of a boy, John Keller, then fourteen years of age. The evidence is practically conclusive that the result of this acquaintanceship was a strong and strange attachment on the part of the defendant for the boy. The evidence also clearly establishes the following facts, namely: The boy left his home and roomed with the defendant at different places in the city of St. Paul, and in the summer of 1904 the defendant took the boy with him to a number of different places where he worked, among others, to Assinniboine where he remained ten days, then returning to St. Paul, thence to Winnipeg, and on December 15 the boy returned to his home in St. Paul. The defendant followed in some ten days thereafter and joined the boy at St. James, this state, where he had gone in the meantime and was with his father. Here the father and the defendant had a serious altercation about the defendant's conduct with reference to the boy; the father telling the defendant that the boy should not return with him to Winnipeg and that he would put the boy in the Reform School sooner than let him go with the defendant. But despite the father's protest the defendant succeeded in taking the boy with him back to Winnipeg. Some three weeks later the boy received a letter from his mother, with a ticket to St. Paul, urging him to come home. He complied with her request, and the defendant followed him February 13 and there met him, and told the father that he was going South, but was coming back in the spring to take the boy to Winnipeg. The father again told him that the boy should not go with him. The defendant then went South, and from St. Louis, Missouri, he wrote and sent to the boy several letters, of which the following are fair extracts:

March 3, 1905, he wrote:

> Say, why don't you write me? I wrote you two letters, and received no answer. What is the matter? If I do not hear

from you soon, will be in St. Paul to see you. Am not working yet, and am not looking for any, as I guess I will have to go back to St. Paul and see you. Had to borrow money to send this letter, as I am flat broke. Have not felt well lately; besides not hearing from you bothers me. Now, Johnny, why have you not answered my letters? Either you think that now I am gone you can make a fool of me, as you have before, or else you wish me back. You cannot fool me again as you have, because I won't stand for it; so you had better cut it out. You have been playing with me long enough now, Johnny; so it is time you tried something else for a change. Keep your promise to me this time, old boy, as it is your last chance. You understand what I mean, and should have sense enough to keep your promise.

Four days afterwards he wrote:

Well, Johnny, old boy, I think you mean all right, and you must not think I am sore when I tell you anything, because I am not; and I want you to believe that I love you now as much as I ever did, and I intend to do what is right and that everything will be all right soon. Time goes slow, but it won't be long before we will be together, either in Winnipeg or St. Louis, or somewhere else, and then there won't be any reason for us to write again, because we won't part for anything or any one. You know what we agreed upon, and we will stick to it, you bet.

The next day he wrote:

Your letter just received. I note all you say. Also note that you did not give me straight answers to my letter. Now, Johnny, I think it time we cut out all nonsense. It is no use us quarreling by letter. You know how we stand, and also that I won't allow any one to get the best of me this time. I have your promise, and insist on your keeping your word. I shall stay here for a few days waiting for an answer to this letter. Now, as your letter will make quite a difference to me, as it will decide which way I go when I leave here, I wish you to give me a straight answer to my question. Do you intend to

go to Winnipeg with me on the 1st of June or not? I had one chance, but you know why I did not take it. You also know that I am trying to pass the time until May or June, as you know after that date we won't be parted again. We will be together then, one way or the other. This is not a blow, John; and I don't see that you can say that I am anything like that anyhow. You know that when I say I will do anything I do it, no matter what it is. Say, John—say, Johnny, answer this right away, and I am waiting here for an answer, and intend to leave as soon as I get it. If your letter is satisfactory, shall be in St. Paul some time in May. If not, I shall see you in a few days.

March 13 he wrote:

Well, I got yours O. K., and it was something like I expected. So you won't come to St. Louis. Well I won't stay here, either. When you get this, I will be on the road again. You say I cannot blame you if I am not working. Well, I think different. I blame you for anything and everything that happens and has happened. You did not say all you might have in your letter, but your letter makes me think you intend to try and give me the worst of it once more. Do you mean to say that you refuse to go to Winnipeg, when I ask you to? Do you, John? I do not mean to go to St. Paul right away, but if I thought you intend to go back on your word I should be in St. Paul when you get this. I believe you have some sense left, though I know that any one can get you to promise anything or do anything they wish. I cannot believe you have gone back on me, and have good reason to think that others are doing this, not you. If I really thought it was yourself, I would see you so quick as the train would get me there, and you know what would happen.

March 28th he wrote:

I also wish to say that you had better keep my letters to yourself, as the main reason you are going with me is that other people know too much about us already. Now, John, cut out all nonsense from your letter, and write as soon as possible. If

I was in St. Louis and got your letter, I should either be in St. Paul or on the way now. You knew it, too, when you wrote that last letter. I do not wish to leave here until the time I stated, so do not make me unless you wish to see me very much.

And ten days next before the homicide he wrote:

I wrote you two letters last week—one Sunday and one Tuesday evening. I have been expecting a letter from you, but have not got it. Am writing you these lines to say, if you have not already written, I wish you to write as soon as get this. What do you wish me to do? Do you wish me to quit here, same as you have got me to quit every job I got lately? Well, I don't want to say anything out of the way in this letter.

On the morning of April 12, the day the boy was killed, the defendant arrived in St. Paul, and went to the boy's home at No. 1 Reid Court, consisting of two flats. The one downstairs was occupied by Mr. Kline, his wife, and children. The one upstairs was the Keller home. The boy's father was then away from home and the mother asked the defendant, when he made his appearance at her home, what he came back for, when he knew that he was not wanted. The defendant remained at the house for a time, and then went away. He, however, returned to the Keller home about eight o'clock in the evening. Mrs. Keller and the boy were the only persons there, and they and the defendant were the only persons there until after the boy and his mother were shot, about midnight. The boy, while in his bed, lying on his right side, was shot twice—once in the back of the head, and again in the back of his neck. According to the medical testimony the wounds were such as to render any physical movement after he was hit impossible, and immediately unconsciousness followed. The wounds were powder-marked and the hair singed. The mother was shot at the same time in the front part of her body. Each died from the wounds so received. It is admitted that the defendant was present at the time of the shooting and that his revolver was found at the place where it occurred. Thus far there is no substantial controversy as to the facts.

The state called Mrs. Kline, the lady who occupied the downstairs flat, as a witness, and she testified to the effect that between twelve and

one o'clock of the night in question she heard a shot, followed by a fall, in the flat above her, and within two or three minutes thereafter the defendant knocked at her door and told her to go upstairs and stay with Mrs. Keller; that she went to Mrs. Keller at once, and found her in her kitchen with her nightgown on, sitting in a rocking chair and bleeding profusely from a wound; that Mrs. Keller, as soon as she saw the witness, said:

> Bill shot my boy nearly dead, and then shot me. You take a lamp and go and see if my boy is dead.

And, further, that the witness then went into the front room and found him in bed, lying on his right side, his face to the wall, with two bullet holes back of his left ear. The witness' testimony was not entirely consistent as to time and some other details. The state called the officer in charge of the police station, who testified to the effect that the defendant appeared at the station on the night of the shooting and said that he had shot some one up at No. 1 Reid Court, and asked that a doctor be sent up there at once, and, further, that the defendant, upon being asked where his revolver was, replied that it was in the room, and that the witness afterwards found it in the Keller flat. Dr. Moore, a witness on behalf of the state, testified that he asked the defendant why he shot the boy, and his reply was that he did not know, only he wanted the boy to go away with him, and he would not go. This conversation was at the police station at about one a. m.

The defendant's testimony as to the occurrence is, briefly stated, to the effect that he had not slept for three nights, and had been drinking during the day, and went to the Keller home in the evening of April 12; that Mrs. Keller acted queerly, scolded, paced to and fro in the middle of the room, told him that she would not let the boy go with him, that she would see both of them dead first but finally she made up a bed and told the defendant and the boy to go to bed; that before he did so his revolver was placed in his trunk, which was locked, and the key given to Mrs. Keller; that after they had gone to bed she continued to talk, and, being nervous, he could not sleep by reason of the noise she made; so he got up, dressed, started to go out by a door near the head of the boy's bed, when she rushed in and seized him, saying, "You can't go out of here now;" then he lost all consciousness of what was

going on, and the next thing he knew he was in her room with the revolver in his hand looking into the barrel and the room was full of smoke; that he saw her, and she did not appear to be hurt, but she told him she was, and to go and call Mrs. Kline; that he rushed down to get Mrs. Kline, knocked at her door, she responded, and then he made haste to obtain a doctor, and, not knowing where to go for one, he ran to the police station and told the officer in charge that some one was hurt and asked him to send up a doctor; that he was then locked up; felt dizzy and sick the rest of the night; that he had been subject to headaches and dizzy spells all his life; and, further, that he had a great love for the boy, and did not know that he was shot until the officers told him of it.

The trial judge, at the close of the opening statement of defendant's counsel outlining his defense, inquired of counsel whether his defense was insanity or intoxication. Counsel replied that:

> Our defense is, if the court please, that in the frenzy of the moment, the condition in which he was at that time having been brought about by the use of liquor and anger supervening, he had absolutely no remembrance of what took place; that he is not able to say, and that he never has said, what took place at that time; and, if the court please, we claim that that is a frenzy resulting from the mental condition, the condition of his mind at the time—a diseased condition of mind, resulting from liquor and supervening anger; that he had no intention, if the court please; we claim that he did not do it.

> The Court: You rely upon intoxication, then, I take it, as the basis of your defense?

> Counsel: Not that, if the court please. We don't say that the intoxication caused the lapse of consciousness of what was going on; but we do say that the supervening anger caused a complete lapse of memory and consciousness, and that he was not conscious of what was going on—was not conscious at that time, has no recollection whatever of what took place. That is the defense we make.

> Mr. Cormican: And has no recollection of ever having a revolver in his hand until he discovered himself in the middle of the room.

Mr. Clarke: He has no recollection, if the court please, of his having had a revolver, and we think the circumstances will show that he didn't have it, at that time, in his hand, and that it only came into his hand in the course of the struggle; that he has no remembrance whatever of what took place during the struggle, but that he woke up with the revolver in his hand.

The Court: You claim some emotional condition?

Mr. Clarke: Emotional insanity; yes, sir.

The Court: Emotional insanity.

There is no evidence to support this defense of complete lapse of memory and consciousness, except the defendant's improbable testimony to the effect that up to the moment the fatal shots were fired he remembered everything in detail and everything that occurred after they were fired, but has no recollection of firing them. A person is not excused from a criminal act, except upon proof that at the time of committing the act he was laboring under such a defect of reason as not to know the nature or quality of the act he was doing, or not to know that the act was wrong. G. S. 1904, § 6303. The instructions of the learned trial judge to the jury were exceptionally clear, full, and fair, and of them the defendant makes no complaint. They were quite as favorable to him as the evidence warranted.

It is not our purpose to discuss the evidence, except to indicate that any claim that the boy's death was the result of an accidental shot occasioned by the alleged struggle between the defendant and the mother, or that she killed the boy, is simply unthinkable. The wounds in the boy's head and neck conclusively show that they could not have been accidental. On the contrary, they indicate that they were made with deliberation and that the person who fired them was not satisfied by firing once, but repeated the act with the revolver held near the boy's head. That there could have been two accidental shots from the same revolver, held by either the defendant or the mother, while they were standing and she was struggling with him, as the defendant claims, and that both shots could have wounded the boy, lying in his bed, as he was in fact wounded, is too improbable for belief by the most credulous. Again, the defendant's own testimony negatives any suggestion that the mother might have shot her boy; for the defendant

claims that he was in the same bed with the boy, but could not sleep by reason of the noise the mother made, so he got up, dressed,. and it was not until he got to the door near the head of the boy's bed that she rushed in and seized the defendant, when he immediately lost all consciousness of what was going on until he found himself in her room with the smoking revolver in his hand, or, in other words, he had a clear conception of every thing which occurred up to the time he was seized by the mother, and from a time before the smoke from the revolver had cleared, but from the time he was seized until the re-volver was discharged he was unconscious. Any suggestion that the mother left the defendant after he became, as he claims, unconscious, and shot the boy herself, and then forced the revolver into the hands of the defendant, is absurd. If the shots that killed the boy were not accidental, as clearly they were not, then it follows that the mother did not fire them. There were but three persons present when they were fired—the defendant, the mother, and the boy. The boy could not have fired them, for his wounds show that they could not have been self-inflicted, and the mother did not fire them. Who did? The un-disputed facts and the evidence in this case so unerringly point to the guilt of the defendant of the crime of which he was convicted that any verdict other than the one returned by the jury would have been an impeachment of their intelligence and a reproach to the administra-tion of justice.

This brings us to a consideration of the alleged errors relied upon by the defendant as the basis for a new trial.

1. The defendant, when under examination as a witness, was asked by his counsel how Mrs. Keller (the mother) appeared with reference to being under the influence of liquor. The trial court sustained an objection to the question, but permitted him to state all that he had noticed as to her action and condition. Another witness, called by the defendant, and who saw Mrs. Keller about four o'clock in the after-noon of the day of the homicide, was asked by the defendant's counsel if she saw Mrs. Keller drink any beer at that time. The court sustained an objection to the question. It is obvious that there was no error in either of the rulings. As to the first one, the defendant was given the opportunity to state all he had seen or observed in the actions or conduct of Mrs. Keller which would indicate that she was intoxicated,

if such fact were material; as to the second one, the question related to a time too remote to make the answer, in any event, of any value.

Another witness, who saw the defendant at the police station at about two o'clock the next morning after the shooting occurred, was asked by defendant's counsel how he appeared at that time as to being sober or otherwise and able to understand what was said to him. The court sustained an objection to the question on the ground that it was incompetent and immaterial. The question was apparently immaterial, and no statement or offer was made by counsel indicating the materiality of the evidence. It is, however, here claimed in the brief of counsel that the evidence was material as tending to show that the defendant was not responsible at the time Dr. Moore had the conversation with him. The ruling of the court was correct.

Another witness, a physician and surgeon called by the defendant was asked in effect to give an opinion, based upon the nature of the wounds inflicted upon the boy, as to how far the revolver was from his head when it was discharged, and whether it was upside down when it was fired. The court sustained the objections of the state to the questions, to the effect that they were incompetent and immaterial. We find no error in the ruling.

2. The statement or exclamation of Mrs. Keller to Mrs. Kline to which we have referred was received over the objections of the defendant, and the ruling is here assigned as error. It is the contention of the defendant that the statement in question was simply the narration of a past transaction and not so connected with the main fact, the shooting, as to illustrate its character. On the other hand, the state claims that the evidence was clearly admissible as a part of the res gestæ. We are of the opinion that the evidence was properly received. The record shows that Mrs. Keller was one of the victims of the tragedy; that her statement or declaration to Mrs. Kline was made within a few minutes after the shooting took place. It was not mere self-serving, hearsay evidence; for the statement was a natural and instinctive declaration, made in close connection with the shooting and under circumstances precluding any suspicion of fabrication. The evidence was admissible as a part of the res gestæ. The decisions of this court fully sustain this conclusion. O'Connor v. Chicago, M. & St.

P. Ry. Co., 27 Minn. 166, 6 N. W. 481; State v. Horan, 32 Minn. 394, 20 N. W. 905.

3. The trial court permitted the jury to separate after proper admonition during the recesses of the court before the final submission of the cause. This action of the court is here urged as error entitling the defendant to a new trial. Whether the jury in a capital case should be permitted to separate during the trial and before the final submission of the case is a matter within the sound discretion of the trial court. Bilansky v. State, 3 Minn. 313 (427) ; State v. Ryan, 13 Minn. 343 (378). The trial court did not abuse its discretion in permitting the jury to separate in this case. It must be admitted, however, that times and conditions have materially changed since the Bilansky case was decided, and we are inclined to believe that in capital cases, if the trial court has any doubts as to the propriety of permitting the jury to separate during the trial, it would be wise to keep them together, especially in the large cities of the state.

4. The last ground upon which the defendant's motion for a new trial was based is the alleged misconduct on the part of some of the jurors in reading two certain newspaper articles referring to the defendant and his trial. The first one complained of was published on May 15, which was after the trial commenced, but before the impaneling of the jury was completed. The affidavit of one of the jurors was to the effect that a newspaper containing the first article was read by him and other jurors on the day of its publication; but it appears from the record that he was not summoned as a juror until the next day, when he was accepted as an impartial juror. The other article was published on May 18, during the progress of the trial, and referred to a passionate outburst of the defendant in reply to a question put to him when on the witness stand by the county attorney. The article, in so far as it referred to the character of the question and the testimony leading up to the outburst, was a fair report of what took place ; but in its comments upon the manner and appearance of the defendant it was unfair, and showed a bias against the defendant. It fairly appears from the affidavits that some of the jurors read the article. It is to be noted that the article did not purport to state or refer to any matter occurring outside of the courtroom, that it correctly stated the evidence, and that the comments related to matters occurring in

the presence of the jury, who were in a position to verify them. We are not, however, disposed to attempt any defense of the article, and direct our attention to the question whether it appears from the record that the defendant could not have been prejudiced thereby. The alleged misconduct of the jurors in reading the article was an irregularity occurring at the trial, but it does not necessarily follow that the defendant is entitled to a new trial; for, if there be no doubt of the guilt of a defendant in a criminal case, alleged errors, not affecting his substantial or constitutional rights, should not be held to be reversible error on appeal. State v. Nelson, 91 Minn. 143, 97 N. W. 652; State v. Crawford, supra, page 95.

This does not mean, and the court had no intention of holding in either of the cases cited, that an appellate court may assume the functions of the jury, or, if it concludes from the evidence that the defendant is guilty, it may say that, no matter what errors were committed, the defendant is guilty anyway, and his conviction must be affirmed. The rule is that if substantial error is committed on the trial of a defendant in a criminal case, the natural tendency of which is to prejudice the defendant, it will be a ground for a new trial, unless it appears that the jury could not have been prejudiced thereby; but if it affirmatively appears, from the whole record, that the defendant could not have been prejudiced by the error, it is not a ground for a new trial. It would be trifling with justice to grant a new trial under such circumstances. Now, applying the test to this case, it affirmatively appears, as already stated, from the evidence in this case, that the jury could not have returned honestly or intelligently any other verdict than the one they did return. Nor can we intelligently assume that they would have returned a false verdict, if some of them had not read the articles in question. Therefore we hold that the reading of the newspaper articles in question by the jury was not prejudicial error.

There being no reversible error in the record, the order appealed from must be affirmed. So ordered, and that the sentence be executed.

LEWIS, J. (dissenting).

I dissent. The defense was emotional insanity, and the case was submitted to the jury upon the theory that the evidence would warrant a verdict of murder in the first or second degree, or manslaughter in the first degree. Conceding that no error was committed in the rul-

ings during the trial and in the charge of the court, in view of the fact that the jury were permitted to separate during the trial, and received and read certain prejudicial newspaper articles, a new trial should have been granted upon the ground of irregularity in the proceedings and misconduct of the jury.

The attempt is made in the majority opinion to show that the crime was deliberate and long planned, and that no other conclusion was possible; and this assertion rests upon certain excerpts taken from letters written by defendant to the boy. Looking back to these letters, with the incidents of the tragedy in mind, the fact standing out that two innocent lives were sacrificed, no excuse or justification appearing, and by reading here and there and putting emphasis on certain words, possibly the inference may be drawn that for many months the purpose had been forming to destroy the boy and any one else who should interfere with their companionship. But it was for the jury, and not this court, to determine whether such an inference is justified. However, other extracts may be taken from some of the letters which, when read in connection with the entire contents thereof, tend to show a relation of great friendship, trust, and confidence, an unusually deep attachment and unselfish interest in the boy; and when all the letters are considered as a whole, even retrospectively, they are inconsistent with the theory of a deliberative and premeditated murder.

The first of this series of letters was dated March 3, 1905, and is quoted in part in the opinion, but closes as follows:

> Well, old boy, I should like to think that it is not your fault, as I used to; but it looks as if it was you now. Well, Johnny, old boy, you know how I love you and what I have tried to do for you. I have spoiled my own chances for your sake, and what reward have I got? Well, we will try once more and make a success of it, or———. Well, John, I might get a letter from you in answer to one of mine; but what makes you take so long before writing? Tell me all about yourself when you write.
>
> Hoping to hear from you soon, I remain your loving friend,
>
> Bill.

Reading this letter as a whole, it does not necessarily convey a threat against the life of the boy, and, when read in connection with defend-

ant's testimony, is consistent with the theory that he had assumed a sort of protectorate or guardianship over him, had furnished him with money, and attempted to instruct him in his trade. And so with the letter of March 7, found on page 194 of the record, from which an extract is set out in the opinion. If any sinister motive or threat may be inferred from that part of the letter copied, it is explained when taken in connection with that part which is not referred to in the opinion:

> Now, John, I always tried to learn you to do things right, and should like to see you do the same. * * * I want you to believe that I love you now as much as I ever did, and think you intend to do what is right, and that everything will be all right soon. * * * Say, John, if you find that job too much for you, and you wish to be with me, you don't have to wait for the time we agreed on, but come right away. I could be working if I felt well enough, and if you were here would be working sure. Be sure and say what you think about the plumbing school I spoke about in my last letter.
>
> From your loving friend, Bill.

The next extract in the opinion is taken from the letter of March 18, and consists of portions taken from selected parts, conveying a very inaccurate sense of it as a whole. It is found on page 178 of the record, and the more important passages not referred to in the opinion are:

> You know that if you deal square with me I will try and do my best for you. I think you will change your mind about some things soon. I have been to Cincinnati since I wrote last. Went to take care of horses on train, got pass back, and, as I expected to get letter from you, used it and got back in time to get your nice letter. I don't care much for the style of it, but think it funny. I don't want you to say any more about what is past, if you intend to act straight in the future. * * *
>
> Now, Johnny, old boy, you know how I care for you, and also know that I would do anything for you that I consider right. So consider everything, also remember our talk we had together before I left St. Paul. Why is it you turn against me now? Is it because I am in poor luck and broke? * * *

I told you all about my past, and gave you a true account of it, too. I did not think you would care for me after, but you told me then that you cared more for me then than you did before. I would not try to make friends with any one without letting them know my record. Well, everything you did at that time got me to care more for my little partner. Don't turn against me now, old boy, just when I need a friend more than I ever did.

Evidently this man had seen dark days, but had found a friend in this boy, in whom he confided and trusted, and whom he appeared to want to help.

The extracts set out in the opinion from the letter of March 13 constitute another instance where only portions are extracted and put together, apparently making a consecutive writing, whereas it requires a consideration of the entire letter to ascertain the meaning of the writer. The following selections illustrate the theory that no immoral motive induced the correspondence:

If you stuck to me, would I be bumming around the country, or would I be working steady and saving money for us both? Just think, John, old boy, think of the number of times you told me you cared for me, how you got me to give up my habits, and at the same time the few friends I had. Why did I do it? Why did you get me to think you cared for me? Was the little you got out of me worth it? To wreck a man's life, spoil all his chances, try to drive him crazy, or send him to the pen, will you do all this, John, or will you stick to your word this time? * * * I need you to keep me straight for awhile until I get settled somewhere.

The letter of March 28, found at page 192 of the record, contains the following:

So keep our business to yourself until such time as I wish to make it public. You know that my letters to you have been crazy enough, but you also know that I don't write such letters to any one else. As for your mother, you know that I always said that she was all right, and that I have the greatest respect

for her. She will not interfere between us, I know, as she knows whether you will be better off with or without me.

This letter bears out the claim, made by the defense at the trial, that the mother had consented to their traveling together to look for work, and these expressions of respect for the mother are not in harmony with any base relations with the boy and are inconsistent with a plan to effect their murder. Another letter appears in the record on page 189, not referred to in the opinion, dated at Cairo, Illinois, March 26, in which the writer refers to their probable trip to Winnipeg the following June, and looks forward to meeting the boy at St. Paul, and contains the following declaration of friendship:

Well, Johnny, old boy, we will stick together this season, and then, if you wish to leave me on your own account, I won't prevent you; but I shall be sorry to lose you even then, because I do care for you.

Another point emphasized in the opinion in support of the argument that the evidence unerringly and conclusively leads the mind to but one conclusion—murder, deliberate and premeditated—is the incident at St. James. The record does not support the assertion that the father objected to the companionship because of any unnatural relation between defendant and the boy. He objected to his son leaving St. James and going with defendant, as of course he had a right to do; but that such objection was based upon the ground intimated by the state was entirely unproved. If it were true, there would have been no mere objection by the father, and friendly relations between him and defendant would then and there have been immediately severed. But after that date defendant visited at the home of the father and was upon friendly terms with him at St. Louis, and Mr. Keller did not deny that he had written defendant asking for a loan of money. Besides, during most of the period under consideration the father was away from home, and the son was living with his mother, and upon cross-examination Mr. Keller stated that so far as he knew the boy might have accompanied defendant upon their various trips with the consent of the mother, all of which is consistent with an innocent friendship, although opposed by the father.

Defendant gave no coherent account of the tragedy. He protested that he could not have killed his friends, that there was no reason for shooting Johnny and his mother, and claimed that his mind was a blank as to the details of the occurrence, and immediately thereafter appeared at police headquarters, excited and faint, and urged the officer to send a doctor quick—that he might have hurt some one. His conduct and declarations are consistent with the theory that the deed was committed in the heat of passion, or at least without deliberation. While it conclusively appears from the evidence that the boy met his death at the hands of defendant by means of a revolver, that the shooting was inexcusable and unjustifiable, yet the evidence is convincing that the tragedy was the outgrowth of some sudden quarrel or disturbance, and was committed in the heat of passion brought about by the peculiar, excitable temperament of the man, his love for the boy, and the probable interference with their companionship. To what extent defendant became unbalanced, and to what degree an intention to effect death was manifested, were unquestionably the exclusive and absolute duty of the jury to determine.

The degree of guilt, as shown by the circumstances surrounding the commission of a homicide, is well defined in the law, as the result of long experience. By the common law murder was the unlawful killing of a human being with malice aforethought, expressed or implied. There were no degrees of murder, and all such crimes were punishable by death. But the legislature in its wisdom, in common with many other states, divided murder into degrees according to the circumstances attending its commission. This, upon the theory that in natural justice the penalty of death should not be inflicted in cases where the evidence indicated that the homicide was the result of sudden passion or impulse, and not committed with deliberation, reflection, or a fixed and determined purpose. A homicide committed on a sudden impulse may be premeditated, in a certain sense, because of intent to kill, yet it is not deliberate, and therefore does not constitute murder in the first degree. Copeland v. State, 7 Humph. (Tenn.) 479; Commonwealth v. Drum, 58 Pa. St. 9; Leighton v. People, 88 N. Y. 117; Fahnestock v. State, 23 Ind. 231.

To constitute murder in the first degree there must be a fully formed purpose to kill, with so much time for such deliberation and premedi-

96 M.—24

tation as to convince the jury that such purpose is not the immediate offspring of rashness and impetuous temper, and that the mind has become fully conscious of its design. Commonwealth v. Drum, supra. It is enough, however, if there is time for the mind to think upon or to consider the act and then determine to do it. In Leighton v. People, 88 N. Y. 117, it was said: "An act coexistent with and inseparable from a sudden impulse, although premeditated, could not be deemed deliberate, as when, under sudden and great provocation, one instantly although intentionally kills another. But the statute is not satisfied unless the intention was deliberated upon. If the impulse is followed by reflection, that is deliberation." More fully stated in Fahnestock v. State, supra, as follows: "In murder in the first degree, premeditated malice requires that there should be time and opportunity for deliberate thought, and that, after the mind conceives the thought of taking the life, the conception is meditated upon, and a deliberate determination formed to do the act. That being done, then, no difference how soon the fatal resolve is carried into execution, it is murder in the first degree. In murder in the second degree, the purpose or intention to kill is followed immediately by the act, and is not premeditated, the time and the circumstances are not such as to allow of deliberate thought, yet there must be a formed design and purpose to kill."

I will not presume to pass any criticism upon the learned trial court for the manner in which the different degrees of murder were submitted to the jury, but I cannot refrain from expressing regret that murder in the second degree and manslaughter in the first degree did not receive more independent treatment with reference to the evidence. The jury appear to have caught the distinction only in part, for after being in consultation for a considerable time, they returned into the courtroom and presented the following question to the court for answer:

> If John Keller was shot by defendant in the heat of sudden passion, on the spur of the moment, immediately following a scuffle with Mrs. Keller, with intent to kill, but without previous intention, would that be murder in the first degree?

But the court replied that it could be best answered by again reading to the jury that part of the charge which explained the question, and thereupon restated the general principles of law applicable to murder in the first and second degree, and manslaughter in the first degree, without reference to the evidence applicable to the principles announced. I do not claim any error here, but, considering subsequent developments as to influences at work upon the jury, and in view of the fact that the jury were in doubt on this very point, it was unfortunate that such phase of the case was not more independently set out in the charge. However, the trial court was of the opinion that the evidence was not all one way, but that it was doubtful what degree of crime had been committed, and hence the jury must determine it. Had the court instructed the jury that the evidence did not warrant any other verdict than murder in the first degree, can it be doubted that it would have been an infringement upon the province of the jury and error? But the majority of the court, acting as a court of review upon appeal, differ with the learned trial court as to the weight of the evidence, and hold that only one conclusion was possible and that any other than the one arrived at by the jury would have been an impeachment of their intelligence.

Such being the issues, were the jurors permitted to proceed in their consideration of the evidence in that calm, free, and unprejudiced attitude of mind demanded by common consent and guarantied by the law of criminal procedure? According to the affidavit of juror Gorman, after the trial had commenced and the selection of a jury was in progress, at about noon on May 15, the St. Paul Daily News, published at St. Paul, was placed in the hands of one of the jurors, and contained the article referred to in the affidavit as "Exhibit B" and found in the record. Mr. Gorman affirms that he read the article himself, and that many of the jurors commented upon it and accepted its contents as true. The article was headed:

## TWO MURDERERS IN PLOT TO ESCAPE.

### GOTTSCHALK AND WILLIAMS HAD MURDEROUS BLUDGEON READY FOR USE.

### Sheriff Frustrated Plan.

The article contains a detailed statement of an effort made by the two so-called murderers to escape; that Williams confessed to being in the

plot, and that he (Williams), being a plumber by trade, had unscrewed a piece of gas pipe, one inch in diameter and two feet long, which connected the shower-bath arrangement in the bathroom on the third floor of the jail; that Williams admitted it was planned for either himself or Gottschalk, when a favorable opportunity offered, to fell their jailer with the pipe, get possession of the keys, and so make their escape. The article was intensified by a picture of the piece of gas pipe, underneath which were the words, in large letters:

WEAPON WHICH GOTTSCHALK AND WILLIAMS PREPARED TO AID
IN THEIR ESCAPE FROM JAIL.

At the close of the article it was stated that Williams' attorney denied any such confession had been made. The accusation against the defendant was false in every particular, but such fact was unknown to the jurors until the trial was over, and although the paper was placed in the hands of Gorman and another juror before they were selected as jurors in the case, yet it is averred in the affidavit that the article was read, considered, and commented on by different members of the jury while they were in the discharge of their duties in weighing the evidence. It is not denied that the article appeared either in the noon or evening edition of the Daily News on May 15, and there was no attempt on the part of the state to contradict the statements made in the affidavit. The consequence was that certain of the jurors, while considering the evidence, were probably under the impression that the man they were trying for his life was ready to commit another murder, if necessary, in order to effect his escape.

The trial proceeded, and on May 18, in the five o'clock edition of the St. Paul Dispatch, appeared an article bearing upon the trial of defendant, and according to the affidavit of Mr. Gorman, one of the jurors, the jury were permitted to separate during the course of the trial, and during the adjournment on the evening of May 18 the paper referred to, containing the article stated, came into his hands; that he and other jurors read the same; and that he believed, from his acquaintance with the jury and with the circumstances of the trial, that the jury were greatly prejudiced against defendant on account of the article. A similar affidavit was made by juror Reed.

"THAT'S A DAMNED LIE!"

SHOUTS THE ACCUSED,

was the heading in large type, and the paper containing the article is attached to one of the affidavits in the record, and is in part as follows:

Williams' Heated and Unexpected Reply to County Attorney Produces a Tense Moment at the Williams Murder Trial Today —Proceedings in Detail.

Did you ever see a wild beast at bay—teeth exposed, eyes glaring with fury, claws unsheathed for the savage spring? Williams—William Williams—was the wild beast this morning as he sat on the witness stand, baited, surrounded, at bay.

The hell within the man burst forth in uncontrolled fury and he screamed out:

"No sir, it's not; that's a damned lie."

Victims devoted to death used once to stand on the bloody sands of the arena in Rome, a circle of faces all about them.

The scale is infinitely less in courtroom No. 1—a small, poor place to exemplify the ancient show of the arena; but the parallel was visible. Williams sat there on the stand, the center of a semicircle of crowding people that had crushed into the room.

He finished his story to the friendly attorneys for the defense, told it with something like a pacific smile on his great mouth, told it as though it would be received as the correct statement of his unselfish affection for the dead boy, John Keller.

But if he thought for a moment that this pleasant tale of self-denial would establish him as the kind friend of "Johnny" he was terribly deceived.

### Baiting Began.

County Attorney Kane began the cross-examination, the baiting, the prodding, the searching into him, the unrelenting scrutiny into his dark consciousness, and the man endured for a time, and then the hell of hot fury burst forth.

It was a terrible spectacle. The great, strong neck made spectators think of the hangman's eager noose.

The blood of the murdered lad and his mother called calmly and coldly for vengeance, never ceasing the appeal even when the exulting devil within the man prompted him to cry out.

O, if he only held a knife grasped tightly in his right hand; if he could only once more hold with clinched steady fingers the pistol that he had been permitted to examine as he sat there, then how he would have sprung into the arena to fight and die right there in court room No. 1, die at the very feet of Clark and Miesen and the stout Picha.

Surely he would have sprung from that witness stand screaming his defiance, pale, distorted, to kill once more, with a grin of contempt for the dangling hangman's noose.

### Quieted by Counsel.

But he did not spring. Once he half rose from the chair of torture, but sat down again.

"Don't get angry, don't show temper," quieted the counsel, Cormican and Clarke, and the poor, forlorn, friendless animal with the repulsive face subsided, while Kane, county attorney, resumed the attack.

It was no use for Williams to look for friendliness there in that close ring of faces, no use now to apologize, mumbling for the bloody deaths of mother and son sleeping the sleep that knows no waking under the spring sod of the graveyard. Too late, too late, now—and for the moment the hell of despair broke its bounds within him and he screamed:

"No sir, it's not; that's a damned lie."

"You had best close that knife on your table," advised John Clark, veteran policeman.

"Do you think he would really spring?"

"Well, he might."

### What Roused the Devil?

What was it made Williams scream out? Why simply this: He had taken Johnny Keller with him to Fort Assinniboine, where he was working for the United States government as a steamfitter.

Why didn't he stay there at work and good wages rather than abandon his work in about a week?

Because the "sleeping accommodations" were not fit for Johnny. So he bought a home ticket for "Johnny," had fifteen cents left, and then took "freight" home.

Did he remember a man named Marvin?

Yes, Marvin was a foreman.

Do you remember Murphy?

Murphy—Murphy—well it did seem that he had heard the name somewheres.

Now, didn't Murphy object to your sleeping in the same room with that boy? Didn't you tell him that if the boy went, you would go, you would both go. Isn't that true?

And then, face pale with fury, Williams screamed out: "No sir. it's not; that's a damned lie."

Keep quiet, compose yourself, Mr. Williams. A deputy sheriff has stolen around on your left flank there by the south end of the jury box. Miesen is there and Clark and Picha. Don't spring down to fight and die here in the little arena, dark from its hideous blue curtains. Keep quiet, Williams. These strong men would tear you limb from limb.

It was an awful thing to see this homeless hobo sitting there, fighting the world, his only friend, the leering devil within him, urging him on with hot whispers to his doom.

Ignoring the assertion in the affidavit that the jury were influenced thereby, what were the probabilities? Recall here the theory upon which the state conducted the prosecution for murder in the first degree, and that there was another phase of the case inconsistent with murder in the first degree, while considering the probable effect of this newspaper article upon the minds of the jurors. And the majority opinion disposes of it by stating that it did not purport to refer to any matter occurring outside of the courtroom; that the article correctly stated the evidence, and that the comments related to matters occurring in the presence of the jury, who were in a position to verify them.

The only possible ground for the admission of the question as to Marvin and Murphy was to lay the foundation for impeachment of

the defendant. Those questions implied that Murphy was in possession of knowledge which caused him to prevent the continuation of the companionship. The very fact that the question was put to defendant, carrying with it a false insinuation, was the sting which threw defendant into the raging passion described in the article, conceding it to be true. The state, with all the machinery at its command for collecting evidence, was willing to let the imputation rest upon the denial of defendant, without calling Murphy or Marvin to prove the truth of the charge. The defense was powerless. It could not call Murphy and Marvin to support defendant's denial. The insidious insinuation had been lodged in the minds of the jury. It would take some effort for them, unlearned in the law, to perceive that the state had made a sham play. But the "baiting" and "prodding" had caused "the hell of that fury to burst forth"; and this was what the state wanted.

Can it be doubted that this newspaper comment, brought to the jury without the knowledge of the court, had weight with them when considering a critical point in the case? Was this no more than a fair report of the court proceedings? To what purpose has the sanctity of the jurors' prerogative been guarded by statutes if they may ruthlessly be encroached upon in this manner? What a pity the talent exhibited in that write-up could not be engaged in a better service than thus exploiting the frailties of the unfortunate!

I believe the views I have attempted to express are in harmony with the general trend of judicial thought and expression on the subject.

In the case of State v. McCormick, 20 Wash. 94, 54 Pac. 764, the trial court was reversed and a new trial granted on the ground that the court, without permission of defendant, delivered to certain of the jurors letters and newspapers addressed to them, although the letters were from a distance and had been in transit for several days, and the newspapers contained nothing relative to the cause on trial. The court say: "It is the intention of the law that jurors in all actions shall be most carefully guarded from outside influences, and while it is probably true, in this case, that the documents sent in did not influence them in arriving at their verdict, it is possible that they did. * * * The opportunity was given, and the fact that they might have contained something of the kind is sufficient."

In Commonwealth v. Johnson, 5 Pa. C. C. 236, a newspaper containing the following expression was read in the presence of the jurors, and discussed by them: "We hope that strict justice will be accorded (to the defendant), and that, if innocent, which few believe, he may be able to prove it, and thus save his neck from the gallows." This was held to be sufficient ground for a new trial, and the trial court was reversed.

In People v. Stokes, 103 Cal. 193, 37 Pac. 207, a newspaper article was read in the jury room which contained a report of the evidence in the case, including certain evidence which the court had ruled to be inadmissible, and also contained intimations that two of the jurors had been corrupted. A new trial was granted, although it did not appear that the jurors were in any manner prejudiced thereby, and in that case the rule is stated (taken from Woodward v. Leavitt, 107 Mass. 453, 466): That where evidence has been introduced tending to show that without authority of law, but without any fault of either party or his agent, a paper was communicated to the jury which might have influenced their minds, the testimony of the jurors is admissible to disprove that the paper was communicated to them, but not to show whether they were influenced by it.

Williams v. State, 33 Tex. Cr. 128, 25 S. W. 629, 28 S. W. 958, is a very instructive case, intensifying by contrast the rule that when a newspaper contains a true report of the evidence, and nothing more, the inference cannot be raised that the jury were prejudiced thereby. The court say: "So far as we are able to gather from transcript, there is nothing in the report, nor in the paper itself, which in the slightest degree indicated the drift of public opinion as to appellant's guilt or innocence, nor is any prejudice or bias for or against appellant shown in any comment therein, and it contained no fact that was not introduced in the evidence on the trial."

In Cartwright v. State, 71 Miss. 82, 14 South 526, it was held to be ground for a new trial because members of the jury procured and read newspapers containing reports of the evidence, accompanied by comments of the reporter unfriendly to defendant and calculated to excite prejudice against him.

In Carter v. State, 77 Tenn. 440, a new trial was granted by a majority of the court upon the ground that the jurors had been permitted

to read a newspaper article about the trial of the case. Two of the judges dissented upon the ground that they did not consider the newspaper article inflammatory in character or calculated to prejudice the prisoner's case with the jury, because the article only gave a history of the case and the progress of the trial, concerning which the jurors were as well posted as the writer of the article.

In Walker v. State, 37 Tex. 366, it was held error to allow jurors to have access to newspapers containing an imperfect or incorrect account of the trial, together with the comments upon the persons and character of those connected with the trial. For cases where the newspaper articles were prejudicial, but had been waived by defendant and his counsel, see Bulliner v. State, 95 Ill. 394; State v. Walton, 92 Iowa, 455, 61 N. W. 179. A timely article on this subject appeared in the April, 1905, number of the Green Bag, by Clarence Bishop Smith.

As an instance that trial courts are endeavoring to forestall the effects of the ever active reporter and secure the co-operation of the press, the presiding judge at the famous Suit Case[2] trial in Boston called in the representatives of the press and requested them to refrain from publishing any thing concerning the case in advance of the trial, and then only the actual proceedings; and in this instance the newspapers would undoubtedly have refrained from publishing the articles mentioned, had it occurred to their representatives that such action would be an encroachment upon the duties of the court.

I am aware that in the case before us the matter referred to was not brought to the attention of the court pending the trial. But only thirty days had elapsed since the homicide. The press had written up the tragedy at that time, and it is a matter of common knowledge that there was much public excitement. Under such circumstances, it was a mistake to allow the jury to separate, and in all such cases unusual care should be taken to gain the assistance of the press in securing the proper administration of justice. The trial court having been informed of the true situation upon the motion for a new trial, it was an abuse of discretion, in my judgment, not to grant the motion.

[2]Commonwealth v. MacLeod (not to be reported).