Wanamaker, J.
Was the exclamation of the boy competent testimony?
Both sides agree that this is the only question in the case, and that the testimony is competent only upon the theory that it is a part of the res gestae of the case.
The record discloses that the exclamation arose ■in the following manner:
“Q. You may tell if anything unusual happened there and what it was, anything out of the ordinary? A. We was walkiiig about one hundred and fifty feet from the car, maybe two hundred, I "couldn’t tell you, and I heard the hitting twice, like 'that (indicating), and think there was an argument started and the boy said that the bums had killed his papa with a broomstick. Objection. Objection overruled. Exception.”
It will be noted that there was no objection to *13 the question, and that the objection is to the whole ■;a'nswer.
Now, manifestly, the major part of the answer is competent and responsive to. the question. If the .exclamation of the boy be incompetent, the objection of counsel should have been addressed to that exclamation, asking an order from the court to ex.clude it from the consideration of the jury. But that was not done. Where objection is made to the entire answer, part of which is competent and part incompetent, there is but one thing for the trial judge to do, that is to overrule the objection, and in this case there was no error on the part of the trial court.
But we are not disposed to decide a case of this importance upon the mere failure of counsel to properly save his rights, and shall consider the case on its merits, as if the objection and exception had (been properly made.
Was the exclamation a part of the res gestae f
Wharton’s definition of res gestae is as follows: “Those circumstancés which are the undesigned incidents of particular litigated acts, and are admissible where illustrative of such acts. These incidents may be separated from the act by lapse of time more or less appreciable. Their sole distinguishing feature is that they should be necessary incidents of the litigated act—necessary in this sense: ■that they are part of the immediate preparations for, or emanations from, such acts, and are not produced by the calculated policy of the actors. In ■other words, they must stand in immediate causal relation to the act—a relation not broken by indi *14 vidual wariness seeking to manufacture evidence for itself. Therefore declarations which are the immediate accompaniments of an act are admissible as part of the res gestae; remembering that immediateness is tested by closeness, not of time but by causal relation, o? just explained.” 7 Words and Phrases Judicially Defined, 6130.
Again, Wharton says res gestae are the facts which form the environment of a litigated issue.
Bishop, in his New Criminal Procedure (2 ed.), Section 1085, uses the following: “But it is difficult, perhaps impossible, to formulate an available rule as to what shall be deemed of the transaction, and what shall not. It appears safe to say that the subsidiary act neéd not transpire at the same instant with the main one, or always even on the same day; and, in reason, as well as in accordance with the current of the authorities, the time which divides the two is not the controlling consideration, though it may be taken into the account. Is it presumable that, distinctly and palpably, it influenced or was influenced by the main act, or proceeded from the same motive ? If so, it is admissible, otherwise not.”
Again, the same author, in Section 1086, uses this language: “The admissibility■ of particular acts being conceded, whatever of a nature explanatory thereof was during their performances said, whether by the doers or by the lookers-on, by the parties to the litigation, or by third persons, may, subject to some apparent or real qualifications, be given in evidence whenever the acts are. * * * In a general sense, the declarations from whatever *15 source must, to be thus admissible, be contemporaneous with the act they would illustrate. We may have cases apparently requiring them to be strictly so. But it is, at least, the better doctrine that they are competent whenever near enough to the act either before or after it, to be probably prompted by the same motive, not an afterthought, and apparently to constitute of it a part; otherwise they are not competent.”
Professor Wigmore, in his excellent work on Evidence, Vol. 3, Sections 1745 to 1747, discusses this same question with large ability and logical analysis, showing the foundation of the principle in the doctrine of res gestae as applicable to exclamations and as constituting a striking exception to the hearsay rule.
In Section 1747 the author uses this language: “This general principle is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker’s belief as to. *16 the facts just observed by him; and may therefore be received as testimony to those facts. The ordinary situation presenting these conditions is an affray or a railroad accident. But the principle itself is a broad one. , Its phrasings differ widely in different courts; but there is in the judicial opinion of to-day something of an approach to uniformity.”
The author cites a large number of cases in support of the doctrine.
It is impossible to reconcile the multitude of divers decisions by courts of last resort on the proper scope and limitations of the old phrase res gestae. Many of the states follow reverently and .rigidly the old English rule, that before any exclamation is admissible in evidence on the theory of res gestae, it must be contemporaneous in time with the principal fact in litigation. That is, just as soon as it appears that it is subsequent in time to the principal fact and merely narrative of it, such .exclamation is not a part of the res gestae and is, therefore, not admissible.
This old English rule had its birth in a strange combination of circumstances. First, the inhumanity and barbarity of the penalties provided by the .English law for criminal cases. A century ago two hundred crimes in England were punishable by death. Second, the prisoner had no rights in an English court of justice, save the right to be convicted. He was not competent as a witness in his .own behalf, nor indeed were any members of his family. He was not allowed the privilege of having his own counsel address the jury, and indeed, in earlier days, was not even allowed the privilege of *17 counsel. He had no right of appeal, and many other prerogatives now enjoyed by the defendants were wholly unknown to the English law a century or more ago.
With these barbarous penalties and this outrageously unjust procedure it is little wonder that the humanity of the judge as well as his love of legal casuistry should resort to a strained and technical construction of the law to overcome its barbarity.
Now, while this was none the less judge-made law, its evils were much mitigated by the fact that it was' done in the name of justice and humanity. The judge’s love for justice was greater than his love for law. These were the circumstances and conditions of the English law that gave rise to the technical formalism and procedure in English criminal courts a century and more ago.
' Naturally no other county has had as great .an influence on our American courts as have our English brethren, because of our speaking a common language and having a common law as well as a multitude of varied and very common interests. This procedure was adopted in many of our states, though the English cruel and barbarous conditions as to penalties and procedure never prevailed in such states; but such is the force' of precedent that the English doctrine was faithfully followed by many of the courts of last resort, without the least justification for such superstrict interpretation of the rights of the accused or such over-refined distinctions as to both the substantive and adjective law of the state.
*18 The second class of states practically Ignored the old English doctrine of contemporaneous character of facts or exclamation and considered chiefly the causal connection or logical relation that the secondary facts sustain to the primary facts in controversy.
Now, applying the doctrine or test of causation, it would be expected not infrequently that there would be an appreciable interval between cause and effect, between those things that have a logical relation, such as the commission of an act and an impulsive exclamation concerning the same.
That the natural language of a given situation or environment would not always be contemporaneous with the primary fact is quite obvious. But is it, therefore, any less a part or incident of the primary fact of the situation? The outcry of the injured party immediately after the assault should be as relevant as during the assault, because he may be bound and gagged or unconscious by reason of an assault, so that he could not make an outcry, which, if made during the assault, would be competent according to all authorities; but by reason of its being delayed ten or twenty seconds after the' assault it would not then be competent. This makes the relevancy or relation of the facts turn on a few paltry seconds of time rather than upon the natural and logical relation of the facts.
Now, when the exclamation is the combined result of the tragic circumstances of the situation making an awful and fearful impression upon the human mind, especially that of a child seeing its own father murderously assaulted, the child being *19 overwhelmed with fear and grief because of the darkness of the night, the absence of a helping hand, grief of parental loss, with nobody to appeal to, all these combined placing the child under natural and extreme excitement, and then, after a few seconds, some one comes into his presence to help, what is more natural, indeed necessary, in such situation than just such an exclamation as we have in this case, ‘-The bums killed pa with a broomstick” ?
The language proceeds from impulse, from the natural and necessary impressions made by the acts of the parties in controversy, so that the human mind in its helplessness or despair, or its natural and necessary anxiety, acts under an impulse or a spontaneous influence that is a sort of echo or reaction from the general situation. The time limit recognized by those courts that fall under this second class which disregard the strict contemporary character, is placed at a point where there is no opportunity given for fabricating or manufacturing some statement or story according to one’s self-interest.
If the father had made some declaration during the assault all authorities agree that it would be competent, but if he had been unconscious or partially unconscious by reason of the severity of the assault, so that he was unable to make any exclamation until a minute or so afterward, would his exclamation be therefore incompetent? We think this is too much like hairsplitting.
But it is said the boy was not participating, that *20 he was a mere bystander, and that therefore his ■ exclamations are not competent.
Under the old English rule this was true. But what reason could possibly exist for such a rule, excepting the bald protection of the defendant, it is difficult to understand. Ordinarily in other cases bystanders are presumed to be rather more impartial, more disinterested, than those who are the active participants, and the average mind would feel this fact should rather strengthen the probative force of the exclamation than weaken it.
Again, it is urged that the boy was not' old enough to be a witness, and therefore his exclamation should not be admitted. But exclamations are not admitted on the ground of the legal competency of the person making them, but because they are a part or reflection of the transaction. By the same token the growl of a dog or the neighing of a horse is also competent as res gestae. The exclamation in this case should be just as competent, yes more so, than the exclamation of a female person who has been assaulted in a case of rape, which the authorities all agree is allowed as a part of the natural and necessary language of a person who has been brutally assaulted, though the exclamation may be made even some days after the occurrence' of the criminal assault if there be a reasonable ex-! planation for the delay.
An interesting incident in the life of Lincoln will serve to illustrate these involuntary acts upon the part of children that are really only a reflection, a natural sequence to certain prior facts. His biographer, Holland, says: “At one time Abraham *21 was obliged to take his grist upon the back of his father’s horse and go fifty miles to get it ground. The mill itself was very crude and driven by horse power. The customers were obliged to wait their turn without reference to their distance from home, and then use their own horse to propel the machinery. On one occasion Abraham having arrived at his turn fastened his mare to the lever and was following her closely upon her rounds. When urging her with a switch and ‘clucking’ to her in the usual way, he received a kick from her which prostrated him and made him insensible. With the first instant of returning consciousness he finished the ‘cluck.’ ” This was one of the most striking and convincing facts as to what Abraham' was doing when he became unconscious. What stronger proof that he was driving the horse could be given than this exclamation as soon as consciousness returned?
So, in the case at bar, the causal, logical and psychological relation of the whole situation as affecting the boy and his innocent, spontaneous, impulsive, natural and necessary outcry was exactly in keeping with all human experience and what all men recognize in everyday life as tending to prove certain facts. Why should not the same rules obtain in courts of justice to prove the same kind of facts? The rules of evidence are presumed to be based upon the credibility of human experience.
A most interesting case from Georgia, Grant v. State, 124 Ga., 757, is singularly analogous to the case at bar:
“4. Exception was taken to the refusal of the court to exclude the following testimony: ‘Mary’s *22 [deceased’s] child said, “Huss [defendant], you have shot mama.” ’ The testimony quoted was that of Jake Colbert, a witness for the state, and it was objected to ‘on the ground that the solicitor-general, in opening the case to the jury, had stated that Mary Johnson’s [deceased’s] child, the one referred to by the witness Colbert, was too young to be a competent witness or to testify.’ And movant adds that this (the foregoing statement of the solicitor-general) ‘was true, and allowing Colbert to testify as to what the child said was in effect allowing the child to testify.’ We can not agree with counsel that permitting the witness to testify to the words of a little child, too young to be brought into court as a witness, was equivalent to permitting the child itself to testify. It appears from the evidence that the witness Colbert, at the sound of the shots which slew the deceased, ran immediately from an adjoining room into the one where the homicide was committed, and said twice to the defendant, ‘Have you shot Mary?’. The defendant made no answer, but the child, as the defendant silently left the room, uttered the words, ‘Huss, you have shot mama.’ These words, spoken by a little child immediately after the shocking occurrence, were clearly admissible as a part of the res gestae. No declaration could have been freer ‘from all suspicion of device or afterthought,’ and it was, in point of time, almost concurrent with the act to which it referred. It was the very deed itself speaking through the mouth of a babe.”
Jn another case the supreme court of Georgia, in Kirk v. State, 73 Ga., 620, held as follows: “Evi *23 dence that immediately after the deceased was shot, a person near by hallooed and asked him what was the matter, and who had shot him, to which he replied that the defendant had shot him, was admissible both as part of the res gestae and as corroborating the dying declarations of the deceased.”
The supreme court of Minnesota, in State v. Williams, 96 Minn., 351, held a statement, to the effect that the defendant shot the deceased and herself, made by a party other than the deceased, but who was mortally wounded at the time of the homicide, and made in close connection with the event and under circumstances precluding any suspicion of fabrication, was properly received in evidence.
The court in its decision uses this language: “It is the contention of the defendant that the statement in question was simply the narration of a past transaction and not so connected with the main fact, the shooting, as to illustrate its character. On the other hand, the state claims that the evidence was clearly admissible as a part of the res gestae. We are of the opinion that the evidence was properly received. The record shows that Mrs. Keller was one of the victims of the tragedy; that her statement or declaration to Mrs. Kline was made within a few minutes after the shooting took place. It was not mere self-serving, hearsay evidence; for the statement was a natural and instinctive declaration, made in close connection with the shooting and under circumstances precluding any suspicion- of fabrication.” The evidence was admitted as a part, of the res gestae.
*24 In an unreported case of Collins v. Commonwealth, 24 Ky. L. Rep., 884, the following is held: “The exclamations of the wife and daughter of H. immediately succeeding the shooting were competent as a part of the res gestae
The supreme court of Illinois has held in 104 Ill., 248, Lander v. People, as follows: “The true test of the admissibility of such testimony is that the act, declaration or exclamation must be so intimately interwoven with the principal fact or event which it characterizes, as to be regarded a part of the transaction itself, and also to clearly negative any premeditation or purpose to manufacture testimony.”
Under this doctrine the court held no error was committed on the trial of one upon the charge of rape, where two witnesses were called who were near by and witnessed the perpetration of the offense and testified that they saw and readily recognized the accused near the scene of the transaction on the next day thereafter, and that one called the attention of the other to the accused, exclaiming “There goes the man!” and that the other replied, “Yes, there he goes.” The defendant objected to the witnesses repeating their, exclamations made at the time, but the court permitted the same.
Many more decisions under the same line might be cited and discussed, but the best-considered cases where the courts have gotten away from the old English rule prefer the test of causal connection, logical or psychological relation and association as the true and proper test of relevancy.
*25 Underhill in his excellent work .on Criminal Evidence (2 ed.), Section 93, p. 174, uses this language : “These declarations must possess three characteristics: First, they must have been uttered contemporaneously with and grow out of the act upon which they have a bearing so as to be spontaneous and not narrative; second, they must qualify, illustrate, explain or unfold its character or significance, so as, third, to be connected with it in such a manner that the declaration and the act form a single and indivisible transaction.”
This doctrine would seem to disqualify the exclamation according to the author’s judgment. But just prior to this rule announcing the qualifications necessary to admit the evidence, he uses this language, Sec. 93, p. 173: “Usually statements made by third persons not produced as witnesses are objectionable as hearsay. But, it has been remarked, here the events speak for themselves, giving out their fullest meaning through the unprompted language of the participants. The spontaneous character of the language is assumed to preclude the probability of its premeditation or fabrication. Its utterance on the spur of the moment is regarded, with a good deal of reason, as a guarantee of its truth. These instinctive utterances are as much original evidence as are the events whence they emanate or of which they form an inseparable part. Their value as evidence does not depend in the slightest degree upon our confidence in the credibility of the declarant, or upon our knowledge of him as a man who habitually tells the truth. He is regarded merely as the channel through which *26 the events describe themselves contemporaneously, or nearly so, with their occurrence.”
So that, taking all that Underhill says upon this subject, it is apparent tha.t he does not intend to give the word “contemporaneously” that strict construction required by the English rule, but the liberal construction, which he indicates by the language “or nearly so,” that is now recognized and applied by many of our American states.
To cite other authorities would be superfluous. We feel, however, that it is but just to say that the judgment of the court of appeals in this case finds abundant warrant in the former decisions of this court in analogous cases.
We believe, however, that the demands of justice, as well as the probative force and effect of such exclamations made where there is a maximum probability as to their truth and a minimum possibility of artifice or fabrication by reason of their being the natural, spontaneous and, sometimes, as in this case, the necessary language of a child, require that the old rule should be relaxed and liberalized so as to meet the naturalness and necessities of the case, as well as to put the jury and court in possession of all the facts, circumstances and environment immediately before and after the principal fact in controversy.
The state contended before the court of appeals that, if the admission of the boy’s exclamation was error, such error was not prejudicial, because, first, the word “bums” identified nobody, and second, there was other evidence tending to show that the fatal wound was made with a stick or a club. This *27 contention of the state was overruled by the court of appeals, and in this respect the court was undoubtedly right. The exclamation of the boy under' the circumstances, that it was made in its relation to the transaction, being the sole eyewitness save- and except the defendant, speaking under great excitement and impulse, freed from opportunity or occasion to dissemble or fabricate—all these things undoubtedly gave the boy’s exclamation great weight with the court and jury. But the primary reason for such great weight was by reason of its causal connection, its logical relation to the facts in the case, and because it was the natural language of the whole situation speaking through the little boy. That relation made it competent, though it be not strictly contemporaneous.
We find no other error in the record of the court of appeals. The judgment of the court of appeals is reversed and the judgment of the court of common pleas is affirmed, and cause remanded to the court of common pleas for further proceedings according to law.

Judgment reversed

Nichols, C. J., Johnson, Donahue, Newman and Wilkin, JJ., concur.